385 So.2d 804 (1979)
B. J. LUCAS, Plaintiff-Appellant,
v.
W. E. "Coon" DEVILLE et al., Defendants-Appellees.
No. 7185.
Court of Appeal of Louisiana, Third Circuit.
December 21, 1979.
Dissenting Opinion December 26, 1979.
Rehearing Denied February 4, 1980.
On Rehearing April 9, 1980.
Writs Refused June 13, 1980.
Ford & Nugent, Howard N. Nugent, Jr., Alexandria, for plaintiff-appellant.
Gold, Little, Simon, Weems & Bruser, Edward E. Rundell, Gravel, Roy & Burnes, Camille F. Gravel, Jr. and Anna Dow, Alexandria, for defendants-appellees.
Before CULPEPPER, DOMENGEAUX, GUIDRY, FORET and STOKER, JJ.
*805 STOKER, Judge.
This is a suit by plaintiff-appellant, B. J. Lucas, for personal injuries sustained in an industrial accident. The accident occurred on August 6, 1976, while Lucas was performing services for his employer, Pelican Truck Lines, Inc. There are two defendants in this case. One of the defendants is W. E. "Coon" Deville, also an employee of Pelican Truck Lines, Inc. and who plaintiff alleges is an executive officer of Pelican Truck Lines, Inc. The other defendant is Market Insurance Company, the comprehensive general liability insurer of Pelican Truck Lines, Inc. The petition alleges that plaintiff's injuries resulted from negligence on the part of W. E. "Coon" Deville; therefore, this is an "executive officer" suit, so called.[1]
The issues are (1) was Deville negligent so as to be liable to plaintiff, and if so, (2) was Deville an executive officer of Pelican Truck Lines, Inc., so as to be within the liability coverage of the policy of Market Insurance Company, and if so, (3) did Market's policy contain exclusions of coverage under the circumstances, and (4) if plaintiff is entitled to recover from one or both defendants, what amount will compensate plaintiff for his damages?
We avail ourselves of the statement of facts contained in the trial court's reasons for judgment. We also set forth its holding relative to the liability issue. We quote in part therefrom as follows:
FACTS
Sometime before August 6, 1976, Mr. A. D. Chisum of Sicily Island, who was in the sand, gravel and cement business, decided to sell a cement hopper and agreed with an unidentified buyer to dismantle the hopper and put it in transportable condition. Around August 4, 1976, Chisum telephoned the Pelican Truck Lines, Inc. office in Jena and asked for help in getting the hopper down and onto a set of wheels. On August 5, 1976 Chisum met with W. E. Deville, a truck pusher for Pelican, and showed him the hopper and the site from which it was to be removed. In the telephone call and during the on site inspection, Chisum represented to Deville that the hopper was empty.
The hopper involved was a large rectangular box standing upright on four legs. The box portion was eight feet square on the top and bottom and twelve feet tall with a cone or pyramid shaped bottom fitted with a gate valve at the lower end through which dry cement could be emptied by gravity into a truck below. Including the four steel legs, the overall height was approximately forty feet. The empty weight of the structure was in the ten to fifteen thousand pound range. The hopper was equipped with a vibrator that could shake the cement enough to cause it to flow if it became packed inside. On the top there was a manhole cover which was by design water tight and which could be unbolted and removed to permit access to the interior of the bin.
The bin was as indicated, 8 X 8 X 12 feet. It thus could contain 768 cubic feet of material. The bottom part of the bin below the 12 foot tall "box", was cone or pyramid shaped with an 8 X 8 foot base. The "height" of the cone or pyramid was not given and thus its cubic capacity cannot be exactly computed. It can reasonably be estimated however that the total capacity was probably in the neighborhood of 800 cubic feet.
This particular bin was being used to store and load dry cement. Such material weighs 94 pounds per cubic foot. Thus, the contents of this bin could weigh up to about 75,200 pounds. At 27 cubic feet per cubic yard, one yard of dry cement would weigh 2,468 pounds. There *806 may be some variation in the weight of cement as Mr. Chisum testified a yard might weigh between 2,500 and 3,800 pounds.
Pelican Truck Lines generally moves oil field equipment. It had in the past moved one cement hopper and had on other occasions moved similar hoppers used by oil drilling operators to hold drilling mud compounds. The method used to move the drilling mud hoppers is the same as used in this case. These other hoppers were similar in design but were usually smaller or mounted lower than Mr. Chisum's hopper.
The procedure envisioned by Deville was one using two gin pole trucks and drivers, including plaintiff, who were familiar with the procedure. Mr. Lucas was to place his truck, which was Pelican's largest gin pole truck, on one side of the hopper and reel out a length of cable from a winch through the upright gin poles. The cable was attached to the cement bin. Another gin pole truck was positioned on the other side of the cement bin and rigged up on similar fashion. Somehow the legs on one side of the bin were hinged and the legs on the side opposite from the hinges were unbolted or cut. The smaller of the two trucks was to pull the bin over from the hinged side. The larger truck, driven by plaintiff, was to be used to gradually let the bin down so it would end up laying on its side. Mr. Lucas was to operate the powered winch on his truck from inside the cab and gradually let cable out to control the downward movement of the hopper.
The operation commenced as planned on the morning of August 6, 1976. Mr. Chisum was present and the bottom gate of the hopper was open. No cement was coming out of the bin. Mr. Lucas was in the position assigned to him by Mr. Deville. The other truck pulled the hopper over as planned while Lucas gradually released cable from his side. Suddenly as the hopper reached the point where it would tip over, gravity and the weight of the hopper overwhelmed Mr. Lucas's equipment. His truck was tipped up on its back wheels. The cable disengaged or broke and the truck dropped back into its normal upright position. The up and down motions were forceful enough to break the seat from which Mr. Lucas was operating the winch. He sustained a facial laceration and immediately complained of severe back pain. He needed assistance to get out of the truck and was immediately transported to the LaSalle General Hospital near Jena, Louisiana.
After the accident Mr. Chisum's employees removed approximately five cubic yards of unmixed dry portland cement from the bin which purportedly had been empty, but which in fact was not. The load on the cable of Mr. Lucas's truck was thus underestimated by between 12,340 and 19,000 pounds. In effect, the bin being lowered weighed about twice what was expected. Instead of 10,000 to 15,000 pounds, there were up to about 34,000 pounds of load being lowered. The overload was at least 12,340 pounds.
Pelican owned a large mobile crane which was not employed in the August 6th attempt that resulted in this litigation. Its lifting capacity was not established in this case. Mr. Deville was authorized to select what equipment was needed for a given job. He elected to use the procedure described above to dismantle or lower Chisum's cement hopper.
* * * * * *
W. E. Deville was authorized by Pelican Truck Lines to supervise any job assigned to one of his crews. He was employed as a "truck pusher" by Pelican. He could select what equipment would be used. He could call a crew off a job or stop work or direct that work not be started if in his opinion the equipment was not in good working order or not suitable for a given task or if other unsatisfactory conditions were encountered. On this job, he could have directed that the equipment movement not be undertaken if the cement bin had still been connected to an electrical power source. He could have done the same thing had he noticed or had been informed the bin *807 contained a significant quantity of cement. He was empowered to call out Pelican's crane if he determined it was needed. He was a member of Pelican's board of directors.
The corporate president, David Deville, was generally regarded by W. E. Deville and the other truck pushers as being the only corporate officer who could agree on behalf of Pelican that Pelican would enter into a contract to perform a given job. David Deville controlled hiring of personnel. Pelican is a closely held corporation that in fact is operated by David Deville alone. The board of directors seldom or never meets.
In the trial court's conclusions, it stated the following:
This Court is of the opinion this accident was most unfortunate and the reason for it is readily apparent now. Nevertheless, the question of whether or not W. E. Deville was negligent turns on the facts and information available to him before the accident. As related above, Pelican regularly moves heavy objects but does not do so often for customers in the cement business. Here, W. E. Deville was dealing with someone he knew had been engaged in the cement business for some time. Thus, it is my belief Deville was reasonable in accepting Chisum's verbal assurance the hopper was empty. Furthermore, the door at the bottom of the hopper was open and no product was coming out. The conclusion, that the hopper was empty was erroneous but in this case Deville had ample and reasonable cause to believe it was true. Under such circumstances, I believe it would be unreasonable to conclude he had a duty to look further. The evidence reflects he had no reason to suspect Chisum was in error and thus was not on any notice this object was likely to be so much heavier than it appeared to be. It is my view the equipment employed on this job was adequate to handle the empty hopper easily.
Mr. Deville had a duty to provide reasonably safe equipment that was adequate to handle the job to be done. He was not, however, obligated to guard against every possible risk or to use extraordinary caution or care in these circumstances which provided no warning or notice that the object was substantially heavier than it appeared to be.
For the reasons stated above, the demands of Mr. Lucas must be rejected at his costs.

NEGLIGENCE OF W. E. DEVILLE
As the trial court couched it, the issue of whether Deville was negligent or not "turned on facts and information available to him before the accident." In this respect the trial court was of the opinion that Deville "was reasonable in accepting Chisum's verbal assurance the hopper was empty." Although the conclusion that the hopper was empty was erroneous, the trial court was of the opinion that "Deville had ample and reasonable cause to believe it was true." Therefore, it would have been "unreasonable to conclude he had a duty to look farther."
A case quite analogous to this case is the Louisiana Supreme Court case of Canter v. Koehring Company, 283 So.2d 716 (La.1973). In that case Jesse Canter was employed by Industrial Construction Company. He was killed as Industrial Construction Company was attempting to lift a weighty "vessel" or tower. Industrial contracted with Pittsburgh Glass Company to build a chemical plant. Pittsburgh, the owner, agreed to furnish all engineering services, specifications, and instruction necessary for the proper execution of the work. In an attempt to lift the vessel furnished by Pittsburgh, Industrial selected a crane which it considered sufficient to do the job based on information as to the weight of the vessel. Pittsburgh advised that the vessel weighed 46 tons (92,500 pounds). However, the vessel included appurtenances weighing about 7 tons (14,000 pounds) consisting of insulations, ladders, piping, catwalks, and other items affixed to the vessel. The extra weight caused the pendant arm link to break, and the crane collapsed. Jesse Canter was killed as a result.
*808 In Canter the Supreme Court held Pittsburgh was obligated to furnish the correct weight of the vessel to be moved, including the weight added by the appurtenances. Several of Pittsburgh's engineers were held to have been negligent in not supplying the correct weight. Industrial's job superintendent, Frenzel, was also found negligent. The Supreme Court discussed the negligence of all parties including Frenzel, on pages 726 and 727 as follows:
Some after-the-fact testimony is to the effect that Industrial's job superintendent knew that extra weight had been added, as did the engineers, but nevertheless proceeded because of an eyeball estimate that it was safe to do so. However, Frenzel, the job superintendent, himself admitted that if he had known the vessel with appurtenances had weighed 106,000 pounds he would have stopped and verified the lifting capacity more closely. Tr. 757-58. He in fact thought the equipment weighed 92,500 pounds, Tr. 710-711, based on the prints furnished by Pittsburgh, Tr. 718.
The standard of care due by the job superintendent and by the Pittsburgh engineers must be viewed in its factual context. They were involved in a lifting operation of unusual magnitude. The particular crane employed was, at best, operating near capacity. Frenzel and the construction engineers were all aware of these facts, as well as of the importance of generally accurate weight estimate in utilizing the crane involved.
Despite this, the engineers and Frenzel proceeded on the basis of the 92,500 pound weight shown by the equipment list, even though they knew some weight had been added by the appurtenances seven tons' worth, it turned out, or more than the crane involved could safely lift.
* * * * * *
Frenzel failed in his duty, as delegated by his employer Industrial, to exercise due care in his supervision over the lift. We find that he was under such notice as to the possible inaccuracy of the weight furnished as to have required him in ordinary prudence to have checked further before undertaking a lift of the magnitude involved.
Thus, Frenzel was one of the five joint tortfeasors solidarily obligated to the plaintiffs.
Defendants urge that Canter is distinguishable on the ground that Frenzel, Industrial's job superintendent, was on notice of the possible inaccuracy of the weight furnished to him and Deville had no such notice.
In both cases an unusual lifting operation was involved and each required adequate lifting equipment. In Canter the owner, Pittsburgh, was obligated to furnish instructions and engineering services. Four of the Pittsburgh engineers were found to have failed in their duty to provide the correct total weight of the vessel and its appurtenances. By implication, at least, the Supreme Court would have exonerated Frenzel, Industrial's job superintendent, except for its finding that Frenzel was on notice of the possibility that the weight given his company was inaccurate. It held that under these circumstances he owed a duty to have checked further before undertaking the lift of the magnitude involved.
As we see the case before us, the responsibilities of W. E. "Coon" Deville and those of the superintendent Frenzel in the Canter case, are not precisely analagous.
In Canter the representatives of Pittsburgh, including the defendant engineers, acknowledged that it is an engineering function to furnish the contractor the weight of the equipment. Four of the five engineers who had been delegated Pittsburgh engineering responsibilities were found negligent in failing to furnish correct information. In the case before us the engineering duties which were necessary should have been performed by Pelican Truck Lines, Inc. As it undertook to do the job of lowering the hopper and its supporting structure, it owed a duty to plaintiff and all others involved in the operation. That duty was to perform the work without subjecting them to unreasonable risk. That duty would include assessment of the factors *809 necessary to determine, from an engineering point of view, a feasible and safe method of accomplishing the operation. This would include providing equipment which was adequate and proper and which would not subject anyone to undue risk of harm.
We do not suggest that the engineering problems in this case were as complex as those in Canter. What we do hold is that since Pelican Truck Lines, Inc., undertook to do the job in question, it was required to furnish all the expertise required. This responsibility was delegated to W. E. "Coon" Deville. However, when viewed realistically, it is apparent that Pelican and Deville applied very little expertise to this job. All that Deville did was to rely on his experience and some sort of "sixth sense" developed in his trade.
It is our opinion that the duties owed by Pelican required more than the functions Deville apparently performed. In undertaking the operation, Deville owed a duty to understand fully what he was about.
In undertaking the operation of the highly dangerous nature which he undertook, Deville owed a duty to all who were exposed to the risk of the operation, to perform all reasonable functions to insure an uneventful operation. In short, in the case before us, Deville was to perform not only the duties required in Canter by Frenzel but also the duties required of the Pittsburgh engineers. There is no evidence in the case before us that Deville did anything but make an intuitive guess.
In our view the negligence of Deville does not turn on the question of whether it was reasonable for him to rely on the representation of Chisum that the hopper or bin was empty. Rather, the question is whether Deville adequately performed the duties of informing himself of the nature, intricacies, weight and other pertinent factors relative to the thing he undertook to lower from its upright standing position. An adequate and proper performance of those duties, in our opinion, would have required an inspection, inside and out, of the cement hopper. A proper performance of that duty would have required that Deville discover the caked cement adhering to the inside of the hopper. At that point, then, it would have been necessary for Deville to re-estimate the weight and probable propensity of the hopper. Had he done so, he should then have concluded that different and more adequate measures or equipment, or both, were needed. As stated above, Deville engaged in no sophisticated assessment of the lowering operation; he simply looked at what he saw from the outside and made a guess. As an alternative operations might have been halted until the cement was completely removed or nearly so.
We are mindful that the expert testimony established that Deville's solution would have been adequate had the build-up of caked cement not been present on the inside of the apparatus. However, his failure to discover the cement build-up caused Deville to make an inaccurate assessment, just as the failure to include the extra weight of the appurtenances in Canter caused the provision of inadequate lifting equipment.
For the foregoing reasons, we are of the opinion that Deville breached a duty which was the legal cause of plaintiff's injuries.
WAS W. E. DEVILLE AN AGENT OR EMPLOYEE LIABLE TO B. J. LUCAS FOR BREACH OF DUTIES DELEGATED BY THE EMPLOYER?
Under the facts as found by the trial court, W. E. Deville was an agent and employee of Pelican Truck Lines, Inc., to whom certain duties had been delegated. Those duties included the duties which were breached by Deville discussed above. They were personal duties owed by Deville to plaintiff, B. J. Lucas, and the breach of them specifically caused his damages. Canter v. Koehring Co., supra, at pages 718 through 723 (particularly page 721) and Coco v. Winston Industries, Inc., 330 So.2d 649 (La.App. 3rd Cir. 1976), reversed on other grounds, 341 So.2d 332 (La.1976). The duties owed to Lucas breached by Deville were, without question, duties owed by *810 Pelican Truck Lines, Inc., which had been delegated to Deville. The facts as found by the trial court, well supported by the record, so indicate. Therefore, the tort liability of an agent or employee for a breach of delegated duties owed by an employer, spelled out in Canter v. Koehring Co., supra, applies here to make Deville liable to Lucas.

WAS MARKET INSURANCE COMPANY THE INSURER OF DEVILLE'S LIABILITY?
Having found that W. E. "Coon" Deville was liable in damages, it is necessary that we determine whether there was liability under the comprehensive general liability insurance policy of Market Insurance Company. The question of whether or not Deville bore such relationship to Pelican Truck Lines, Inc., so as to come within any coverage afforded "executive officers" and others under the policy, is not actually reached. It is clear under the policy that, assuming Deville was an executive officer, or within any classification afforded coverage, a policy exclusion eliminates any such coverage under the circumstances.
The policy specifically provides for an exclusion, worded as follows:
(b) to bodily injury or property damage out of the ownership, maintenance, operation, use, loading or unloading of
(1) any automobile or aircraft owned or operated by or rented or loaned to any insured, or
(2) any other automobile or aircraft operated by any person in the course of his employment by any insured ...
Also, under the section on "definitions," an "automobile" is defined as "... a land motor vehicle, trailer, or semi-trailer designed for travel on the public roads...".
The policy exclusion is clearly applicable and operates to exclude coverage in favor of Deville. Heiser v. Gibson, 386 F.Supp. 901 (E.D.La.1974); Credeur v. Luke, 362 So.2d 1175 (La.App. 3rd Cir. 1978) reversed 368 So.2d 1030 (La.1979)[2] and Mauterer v. Associated Indemnity Corp., 332 So.2d 570 (La.App. 4th Cir. 1976).
Therefore, we hold that Market Insurance Company is not liable to plaintiff under its insurance policy under the circumstances of this case.

PLAINTIFF'S DAMAGES
The plaintiff in this case makes claim for elements of damages consisting of general damages for his pain and suffering and special damages for medical expenses, past and future, and lost wages, both past and future.
Following the accident of August 6, 1976, B. J. Lucas was seen by Dr. Sanit Sirikul of Jena, Louisiana, and was hospitalized at the LaSalle General Hospital. At the time Lucas was complaining of pain in the lower back and a laceration of the right side of the face. Dr. Sirikul found tenderness in the area of the upper lumbar spine with bruises over the area. There was some weakness in the left side of the left leg. Dr. Sirikul had x-rays made which disclosed a compression type fracture of lumbar vertebra one. It was a serious injury. Dr. Sirikul put Lucas to bed with instructions for strict bed rest. Also, he was placed in traction. Plaintiff was closely observed for spinal cord damages, but nothing indicative of such damage showed up except for the possibility that the weakness in the left leg might have resulted from some cord damage.
Dr. Sirikul stitched a laceration over Lucas' right eye which apparently healed without complication. Lucas was rendered temporarily unconscious by the accident, *811 and Dr. Sirikul testified concerning this. He stated, on the assumption that plaintiff was thrown about the cab of the truck so as to strike his head, that the unconsciousness was the result of a mild concussion. Lucas apparently suffered no significant or lasting effects from temporarily loosing consciousness.
Lucas' hospital stay at LaSalle General Hospital lasted from August 6, to August 25, 1976. At some time during this stay Lucas was transported to Alexandria from Jena to the office of Dr. T. E. Banks, an orthopaedic specialist, for the fitting of a back brace. Lucas was then returned to the LaSalle General Hospital.
Dr. Sirikul found that plaintiff was handicapped by a hemiparesis on his right side. This was a partial paralysis which had existed from childhood. It had nothing to do with plaintiff's accident of August 6, 1976, and plaintiff had overcome the handicap so as to be able to work. Previous to the accident of August 6, 1976, plaintiff had sustained a hand injury which he had overcome so as to be able to function as a truck driver.
Dr. Sirikul discharged Lucas from LaSalle General Hospital on August 25, 1976, although he could not be considered cured. Lucas was suffering from pain and weakness of the left leg. Dr. Sirikul prescribed muscle relaxants and medication for a slightly elevated blood pressure. Plaintiff left the hospital with a brace on his back, but he was able to sit up. According to the plaintiff himself, he could only stand or lie down and had to be assisted in changing from one position to the other. Dr. Sirikul advised Lucas to see Dr. Banks, which Lucas did. Dr. Sirikul saw plaintiff again on September 3, 1976, and many more times after that. On September 3, plaintiff was complaining of pain in his back and legs and of cramping of the legs. Dr. Sirikul prescribed Fiorinal, a pain killing drug and a mild tranquilizer. At this time Dr. Sirikul noted no depression on the part of plaintiff. The doctor's final diagnosis was laceration of the right eye, which had been surgically repaired and apparently healed, and a herniated disk at the T12-L1 levels. Dr. Sirikul considered plaintiff disabled from working as a truck driver. The cut over the eye was characterized as a minor cut.
Dr. T. E. Banks, an orthopaedic surgeon, first saw plaintiff on October 6, 1976, upon referral from Dr. Sirikul. (Dr. John T. Weiss, Dr. Banks' associate, had seen plaintiff for the fitting of the brace before plaintiff was discharged from LaSalle General Hospital.) Dr. Banks' findings on October 6, 1976, were the following: (1) soreness in the back; (2) numbness in the left leg; (3) soreness in the left thigh and (4) approximately a fifty percent compression of the body of the first lumbar vertebra as disclosed by x-ray. At this time plaintiff was wearing a hyperextention back brace. Dr. Banks stated plaintiff had a history of having been affected by cerebral palsy, with right-sided weakness and spastic paralysis from birth. He had been previously seen by Dr. Bank's office for the hand injury mentioned above. The hemiparesis, or right-sided paralysis, had affected the right lower extremity so that comparisons of the lower extremities were not very accurate from the standpoint of atrophy and muscle tone.
Dr. Banks advised plaintiff to wean himself from the back brace and to try to strengthen the musculature in his back. The fracture at L1 had healed in a position of deformity with approximately fifty percent compression. Lucas was told to return in a month for further evaluation. He returned to Dr. Banks on November 1, 1976, at which time Dr. Banks advised Lucas to discontinue his back support as it was not doing him much good. In December, plaintiff was still complaining of pain in his back with some complaint of pain in the left thigh and occasional radiation down the mid-calf. Plaintiff still had some back tenderness and tenderness of the lumbosacral area. Dr. Banks suggested the use of a shoe-lift because the legs were of different lengths as a result of the congenital condition of paralysis. The purpose was to eliminate abnormal strain in an attempt to correct the back pain.
*812 Dr. Banks did a myelogram on plaintiff on March 4, 1977, to see if he could determine the reason for the weakness in the left leg. The myelogram disclosed a complete block of spinal fluid at the level of the fracture between T12 and L1. This established the reason for the thigh pain. Banks said it was referred pain from the area of the blockage. From the myelogram finding Dr. Banks concluded that surgery was needed to relieve the nerve root pressure but recommended that the surgery be done by a neurosurgeon. However, he indicated that a combination procedure might be needed, one to handle the decompression of the nerve and another to do a spinal fusion, the latter being an orthopaedic matter. Dr. Banks referred plaintiff to a Dr. Dodson, a neurosurgeon, and plaintiff was posted for surgery on March 10, 1975.
After conferring with Dr. Dodson, plaintiff cancelled the surgery on March 9 and has declined since to undergo the recommended surgery. Decompression type surgery is major surgery and requires a general anesthetic. A fusion would be done in addition, if it was found that the area was unstable. Dr. Banks testified that there is no assurance that decompression surgery will relieve plaintiff's pain, but the doctor was of the opinion that the prospects were favorable. If he does have the surgery, the prognosis is good that it will make plaintiff productive. He would be able to again drive a truck, as long as he is not subjected to extreme trauma, but Dr. Banks would recommend that plaintiff not do any lifting repeatedly of objects weighing over fifty pounds. Doing so would put too much strain on plaintiff's back, whether or not the fusion surgery was done. On the negative side, Dr. Banks pointed out that this might cause plaintiff some trouble. On the other hand, if plaintiff does not undergo the surgery, he will not get any better. Dr. Banks linked plaintiff's disability and his pain to the accident of August 6, 1978. He was of the opinion that there would be only a minimal or slight risk of paralysis if plaintiff submits to surgery.
Dr. Banks discounted the effect of any depression plaintiff may be experiencing as a factor in successful surgery. His testimony in this regard was as follows:
Q. Doctor, if the evidence in this case demonstrates that, in addition to your treatment, Dr. Paul Ware, who is a psychiatrist and neurologist in Shreveport, Louisiana, examined Mr. Lucas and found both sometime ago and today during the course of the trial, and found that Mr. Lucas was suffering from a moderate depressive reaction, would, would that make him less of a candidate for a successful, pain-free operation?
A. Now, my response will not be as a psychiatrist, you realize that?
Q. I understand.
A. Because he is an individual who's worked with people for many years in that particular specialty.
Q. Yes, sir.
A. This man has been depressed to some degree since I've known him. This man was a working man. The man has had a handicap since he was young, young of age, and he had overcome this handicap to be a productive citizen. This man was depressed because he wasn't able to work. He was unhappy because of the mechanism of injury. So, he hadI don't know, I don't see where his depression now would be any different than it has been all along. I think if we can get rid of this man's pain and make him productive, it's just common sense to say that's he's going to get rid of his depression.
From the standpoint of cost, Dr. Banks estimated that surgery for decompression and a fusion would cost about $6,000. The surgeon's fees (for both) would run about $2,500. Hospitalization, to extend to ten to twelve days, would run about $3,000, and the anesthetist would charge approximately $200.
If a fusion was necessary it would take about eight months before plaintiff would recover to be a productive person. Therefore, if plaintiff had had the surgery in *813 March of 1977 with a successful result, he would have been back in condition to be a productive person by the time of trial, October 31, 1978.
Dr. Dodson no longer lived in the Alexandria area at the time of the trial and did not testify. Plaintiff testified that when Dr. Banks recommended surgery he was ready to have Dr. Banks do it. However, after conferring with Dr. Dodson, he changed his mind.[3] According to Lucas, Dr. Dodson discouraged him by telling him that whether or not Lucas underwent the surgery, he (Dr. Dodson) did not believe Lucas would ever again be able to do the kind of work he was doing when injured. Dr. Dodson allegedly stressed the fact that nothing could be guaranteed. It might not relieve the pain. Moreover, it was possible that the operation would leave Lucas paralyzed. In view of Dr. Dodson's alleged attitude, Lucas stated that he developed doubts and fear about the operation and cancelled the surgery. He apparently still thinks about submitting to surgery but vacillates and cannot bring himself to face it.
After plaintiff engaged counsel, the latter had plaintiff evaluated by Dr. Paul D. Ware, a specialist in psychiatry and neurology. Dr. Ware saw plaintiff on October 4, 1977, and did a complete psychological and neurological evaluation in which he reviewed all plaintiff's medical records and hospitalizations. Dr. Ware was of the opinion that plaintiff was suffering from a depression neurosis brought on by the events which had rendered him disabled, unproductive and which had caused him to suffer pain.
Plaintiff testified his sex life was affected by the pain he experienced. Dr. Ware confirmed the fact that a manifestation of depression neurosis is a decrease in, or almost total absence of, sexual desire. People suffering from depression neurosis tend to develop fear of the future, and they develop primary symptoms such as sleep disturbance and appetite disturbance, as well as marked lack of energy. They exhibit some somatic or physical complaints associated with the depression. One of the cardinal results of symptoms is the development of thoughts of suicide. Plaintiff "demonstrated all these symptoms in a rather classical, textbook way". Plaintiff was reduced to tears in the interview. Dr. Ware was of the opinion that the depression neurosis was caused by the accident of August 6, 1976, and would not attribute any part of the cause to his previous physical problems. The doctor gave as his reason the fact that, in his opinion, if plaintiff had been suffering from a depression neurosis of the quality exhibited when he interviewed him, he could not have performed his work. He also did not believe prior events in plaintiff's life contributed to the depression neurosis.
Dr. Ware saw plaintiff on only the one occasion until he again interviewed him during the trial. Dr. Ware had not been treating plaintiff and made no recommendation to him. The depression neurosis was characterized as moderate in nature in the scale of mild, moderate and severe. Depression neurosis interferes with one's functioning, and the interference will continue until the condition of depression improves. Dr. Ware's testimony was interrupted to permit Dr. Ware to re-examine plaintiff. He found the moderate depression persisting and was of the opinion that it would persist unless plaintiff gets some relief from pain. Pain is the main source of the depression. Dr. Ware felt that plaintiff's fear of surgery was genuine.
The testimony of an expert in the field of economics, Dr. John W. Chisholm, was produced. *814 Dr. Chisholm is a Professor Emeritus of Louisiana State University where he taught in the field of economics. Dr. Chisholm made a study of plaintiff's situation and estimated his income losses, assuming that plaintiff would never be able to return to work. Plaintiff was born December 15, 1929, and Dr. Chisholm stated plaintiff had a work life expectancy of 18.1 years which would bring him to the age of 64.1 years. He testified that the Monthly Labor Review published computations of the Department of Labor which show that worker output increases at the rate of 2.8 per annum. He also stated that price level increases, his term for inflation, had been 4 percent per annum, although it was apt to go much higher in future years. He was provided with data as to plaintiff's income from his income tax returns for the years 1973 through 1975 and for the period of 1976 ending August 6, 1976. He analyzed these earnings and concluded that annual income of $15,293.79 was indicated.
Based upon the above, Dr. Chisholm stated that it was his opinion that the estimated income loss by plaintiff from the date of the accident to October 30, 1978, was $34,038.44. Dr. Chisholm also made an estimate as to future loss of earnings. Until age 64.1 years plaintiff's gross income would have been $262,641.46. He derived the present value of this amount discounted at 5 percent and 6 percent. He made a second calculation reflecting a 2.8 percent annual productivity wage increase and a third calculation reflecting an additional factor consisting of a 4 percent annual price level increase. His figures appear as follows:

AGE GROSS INCOME PRESENT VALUE AT 5% PRESENT VALUE AT 6%
 NO WAGE INCREASES DURING REST OF WORK LIFE
64.1 $262,641.46 $166,859.60 $153,814.02
 2.8% ANNUAL PRODUCTIVITY WAGE INCREASE
64.1 $339,057.18 $208,398.67 $190,894.61
 2.8% ANNUAL PRODUCTIVITY WAGE INCREASE PLUS 4% ANNUAL
 PRICE LEVEL INCREASE
64.1 $497,446.95 $292,192.62 $265,275.16

We have recounted plaintiff's post accident history at some length because of the defense which has been raised that plaintiff has failed to minimize his damages. The charge is that plaintiff's recovery should be limited because of his refusal to submit to surgery recommended by Dr. Banks. Defendants rely on Welch v. Ratts, 235 So.2d 422 (La.App. 2nd Cir. 1970); Reeves v. Louisiana & Arkansas Railway Company, 304 So.2d 370 (La.App. 1st Cir. 1974) and Reeves v. Travelers Insurance Company, 329 So.2d 876 (La.App. 2nd Cir. 1976).
The rule requiring the mitigation of damages is stated in Reeves v. Travelers Insurance Company, supra, as follows:
Our courts have espoused a rule in varying terminology to the effect that an injured party is obligated to submit to reasonable medical treatment, including surgery, to minimize his damages against a tort-feasor. Donovan v. New Orleans Ry. & Light Co., 132 La. 239, 61 So. 216 (1913); Dark v. Brinkman, 136 So.2d 463 (La.App. 3d Cir. 1962); Bowers v. Lumbermens Mutual Casualty Company, 131 So.2d 70 (La.App. 2d Cir. 1961); Reeves v. Louisiana and Arkansas Railway Co., 304 So.2d 370 (La.App. 1st Cir. 1974), writs refused.
As related to an award for pain and suffering, the above rule must be applied with extreme caution. The burden is on a tort-feasor to show to what extent the damages should be mitigated.

*815 If an otherwise successful surgical operation would leave an injured party with residual permanent pain and disability, his refusal to undergo surgery should only mitigate the damage award proportionately. In the instant case defendants have not borne this burden of proof.
Some of the subjective factors to be considered in applying this doctrine were discussed in Jenkins v. American Automobile Insurance Co., 111 So.2d 837 (La.App. 2nd Cir. 1959). The doctrine, also known as the doctrine of avoidable consequences appears to have been recognized in numerous jurisdictions. An annotation on this subject appears in 62 A.L.R.3d 9 entitled "Duty to Minimize Tort Damages by Surgery". The summary and comment at the beginning of the discussion in the annotation treat some of the subjective factors to be considered at page 13 as follows:
When the doctrine of avoidable consequences is invoked to support a limitation of recovery on the ground that plaintiff should have undergone surgery to avert the consequences of defendant's tort, a difficult balancing of interests is required. Since all surgery involves a more or less violent assault on the organism, it seems, superficially at least, somewhat incongruous to say to one who has been injured by another's fault that he must suffer an additional invasion of his physical integrity in order to protect the wrongdoer from the full consequences of the wrong. On the other hand, it seems unfair and socially undesirable to permit, or even encourage, the tort victim to voluntarily extend or aggravate his pain or disability, and so enhance his damages, when surgery could readily correct the situation.
Faced with this problem, the courts have resorted to the standard of the ordinarily reasonable man, holding that there can be no recovery for elements of damages which would have been avoided by surgery to which an ordinarily reasonable man, under all the circumstances, would have submitted.
It needs to be emphasized that the injured party is in no way compelled to go to surgerythe only consequence of the failure to do so is to relieve the defendant of liability for those consequences which surgery would have averted.
In determining whether a reasonable man in plaintiff's circumstances would have resorted to corrective surgery the courts have regarded a large number of factors as relevant, and have accordingly admitted evidence concerning these factors. Pre-eminent among these factors appear to be the degree to which the recommended surgery involves a threat of further injury or death, and the strength of the probability that the operation will be successful in alleviating the condition or effecting a cure. Both of these are obviously questions upon which medical testimony will be controlling.
Other factors to which the courts have looked as having some weight in determining the reasonableness of the plaintiff's choice against surgery are the pain involved in the operation, and the expense, effort, or inconvenience involved.
The weight of these factors must, of course, be balanced against the consequences of not having surgery, since clearly a plaintiff should not have to undergo a seriously dangerous and painful operation in order to avert a trivial continuing injury, nor should defendant be compelled to pay for total and permanent disability which could with strong probability be averted by a trivial operation. Few cases in the real world are, however, so clear-cut, and typically the issue of the reasonableness of plaintiff's choice has been held for the trier of fact, in the light of the conflicting medical and other evidence.
Section 16, beginning on page 53 of the annotation referred to above, discusses a number of cases involving injuries to the back or spine. None are precisely analagous to the facts of this case.
This case presents several unusual circumstances in connection with the obligation to mitigate damages. Of exceptional significance is the inability of defendants to *816 produce the testimony of Dr. Dodson. Also, we are confronted with the fact that plaintiff's pain is a major cause of his depression, and the depression undoubtedly affects plaintiff's attitude toward submitting to surgery.
In resolving this case, it must be borne in mind that the defense has the burden of showing that the plaintiff should mitigate the damages. It must rely on the testimony of Dr. Banks. In lieu of having the testimony of Dr. Dodson, the defense might have had plaintiff examined by another neurosurgeon. While his testimony would not have any bearing on what Dr. Dodson actually told plaintiff concerning the scheduled surgery, it would have at least presented the opinion of a surgeon in the same field of expertise as Dr. Dodson. Dr. Banks regarded the surgery as reasonably safe and pointed out that the procedure was neither new nor novel. The type of surgery contemplated has been done for almost twenty years. Nevertheless, it is a surgical procedure of sufficient complexity to be outside Dr. Banks' field of orthopaedics. Dr. Banks could give no absolute assurance that the operation would be successful, although the tenor of his testimony was that prospects were quite favorable. It is not questioned that the proposed surgery is quite serious and may require a fusion of vertebrae.
From plaintiff's standpoint we have no reason to disbelieve him concerning the counsel which he says Dr. Dodson gave him. We think the reasonableness of his refusal to submit to the back surgery should be judged to a large extent based on what he reasonably believes to be involved, rather than what might actually be involved, as represented by the more sanguine views of Dr. Banks. A major factor in plaintiff's thinking is the alleged opinion of Dr. Dodson that, irrespective of any benefits he might derive from the surgery, it is improbable that the surgery would enable him to work again.
On the whole we are of the opinion that defendants have failed to carry the burden of proof on the mitigation issue. For that reason we are not inclined to penalize plaintiff for refusing to undergo the projected surgery. It may be that Dr. Dodson, mindful of the obligation of a surgeon to obtain informed consent before performing surgery, unintentionally overemphasized, in plaintiff's mind at least, the risks of surgery and the inability to predict with certainty that surgery would render plaintiff an effective and productive employee again. However, as noted above, we think defendants have the burden to produce testimony to establish a clear duty to undergo the surgery.
All aspects of plaintiff's situation considered, we are of the opinion that a fair award to plaintiff would be as follows:

Past lost wages $ 34,038.44
Future lost wages 150,000.00
Medical costs 1,183.71
 Total special damages $185,222.15
General damages for pain
 suffering, depression, and
 anxiety $150,000.00
 Total damages $335,222.15

We have not included any damages for future medical expenses. Inasmuch as plaintiff refuses to submit to surgery, and we have made liberal award for loss of wages, most of which is for the future, expenses of the surgery recommended to plaintiff are not in order. Moreover, $1,183.71, the amount we award, is all plaintiff has asked for in his brief.
For the foregoing reasons the judgment of the trial court is reversed. It is now ordered and decreed that there be judgment in favor of plaintiff, B. J. Lucas, and against defendant, W. E. "Coon" Deville in the full sum of $335,222.15 together with judicial interest from date of demand until paid and for all costs of these proceedings, including the cost of this appeal. Plaintiff's demands against defendant, Market Insurance Company are dismissed at plaintiff's costs.
REVERSED AND RENDERED.
CULPEPPER, J., dissents and assigns written reasons.
GUIDRY, J., dissents for the reasons assigned by CULPEPPER, J.
*817 CULPEPPER, Judge, dissenting.
I dissent from the finding of the majority that Deville was negligent. The trial judge carefully reviewed all the evidence and found as a fact that Deville's actions were reasonable under the circumstances. Under the applicable rules of appellate review as stated in Canter v. Koehring Company, 283 So.2d 716 (La.1973) and Arceneaux v. Domingue 365 So.2d 1330 (La.1978), I can see no basis for finding that the trial judge was clearly wrong.
Where reasonable minds can differ, the issue of whether a person has acted reasonably under the circumstances is a question of fact, not of law. This is explained in Prosser, Law of Torts, 4th Ed. at page 207, as follows:
"Since it is impossible to prescribe definite rules in advance for every combination of circumstances which may arise, the details of the standard must be filled in in each particular case. The question then is what the reasonable man would have done under the circumstances. Under our system of procedure, this question is to be determined in all doubtful cases by the jury, because the public insists that its conduct be judged in part by the man in the street rather than by lawyers, and the jury serves as a shock-absorber to cushion the impact of the law. The question usually is said to be one of fact, but it should be apparent that the function of the jury in fixing the standard differs from that of the judge only in that it cannot be reduced to anything approaching a definite rule.
"In many cases, however, the court may be required to remove the issue of the particular standard from the jury. It is possible to say, in many cases, that the conduct of the individual clearly has or has not conformed to what the community requires, and that no reasonable judgment could reach a contrary conclusion. The court must then direct a verdict for the plaintiff or for the defendant, or even set aside a verdict once rendered; or, if the evidence as to the facts is in conflict, instruct the jury as to the conclusion it must draw from a particular version of the facts."
In the case of Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La. 1976) our Supreme Court followed the above rationale. Under the facts of Cates, the court held that since reasonable minds could not differ as to the plaintiff's contributory negligence the question was one of law, and summary judgment was appropriate. If the court had concluded that reasonable minds could have differed, it would have rejected summary judgment and remanded the case for trial.
In Canter, supra, at page 724, the court explained the rule of appellate review of fact as follows:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
In Arceneaux, supra, at page 1333, the court further explained:
As an aid to the exercise of the appellate function of review of facts in civil cases, we attempted to explain, in Canter v. Koehring, supra, without great detail, the appropriate standard. We said that `even though the appellate court may feel that its own evaluations and inferences are as reasonable,' it should not disturb reasonable findings of the trial court when there *818 is conflict in the testimony. We prefaced this observation: `When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error.' 283 So.2d 716, 724 (Emphasis added).
"We did not foresee that this explanation would be misunderstood to mean that: `There is no manifest error when the evidence before the the trier of fact furnishes a reasonable basis for its finding.' We said the appellate court should not disturb this factual finding in the absence of manifest error. The difference is important. `Manifestly erroneous,' in its simplest terms, means `clearly wrong.' We said, then, that the appellate court should not disturb such a finding of fact unless it is clearly wrong."
The majority opinion quotes large portions of the trial judge's detailed discussion of the evidence and his careful analysis of his reasons for concluding under this evidence that Deville acted reasonably under the circumstances. The only thing which I might add is in answer to a contention by the plaintiff that Deville should have used the air vibrators on the sides of the cement bin or should have banged on the sides of the bin with sledge hammers to force out any remaining cement. Mr. Chisum testified that his employees had already used the vibrators and had also banged on the sides of the bin with sledge hammers, but no cement came out. I find no express testimony by Chisum that he told Deville this, but the point is that, under the evidence, even if Deville had used the vibrators or banged on the bin with sledge hammers, no more cement would have come out.
Certain statements in the majority opinion indicate to me that they are requiring of Deville a greater duty than reasonable care under the circumstances. The majority states: "An adequate and proper performance of those duties, in our opinion, would have required an inspection, inside and out, of the cement hopper. A proper performance of that duty would have required that Deville discover the caked cement adhering to the inside of the hopper." (Emphasis supplied) I think this language goes too far. I agree with the conclusion of the trial judge, quoted above, that Deville was not "obligated to guard against every possible risk or to use extraordinary caution or care in these circumstances which provided no warning or notice that the object was substantially heavier than it appeared to be."
In another portion of the majority opinion, it is stated: "There is no evidence in the case before us that Deville did anything but make an intuitive guess." I cannot agree with this statement. The detailed written reasons by the trial judge, quoted in the majority opinion, show that Deville made much more than an "intuitive" guess. As the trial judge states, Deville was dealing with Chisum, whom he knew had been engaged in the cement business for a long time. Chisum gave Deville his verbal assurance that the hopper was empty. Furthermore, the door at the bottom of the hopper was open and no cement was coming out. There is simply no evidence that Deville had any reason to suspect that Chisum was in error in stating that the bin was empty.
If the majority means that Deville made only an "intuitive guess" as to the weight of the bin without cement, such a "guess" was correct. It is not disputed that if the bin had been empty the equipment and the procedure used by Deville would have been sufficient. The experts so testified, the trial judge so held, and the majority opinion does not question this.
Essentially, this case boils down to whether, under all of the circumstances, Deville was negligent in relying on the assurance by Chisum that the bin was empty. Furthermore, on appellate review, we should not reverse the trial judge's finding of fact on this issue, unless he was clearly wrong. I cannot possibly conclude the trial judge was clearly wrong. To do so would, in my opinion, clearly be a substitution of our evaluation of the evidence for that of the trier of fact.
*819 For the reasons assigned, I respectfully dissent.

ON REHEARING
STOKER, Judge.
We granted a limited rehearing in this case restricted to the question of insurance coverage.[1] On the original hearing we held that Market Insurance Company was not liable to the plaintiff under its policy of comprehensive general liability under the circumstances of this case. We relied on the cases of Heiser v. Gibson, 386 F.Supp. 901 (E.D.La.1974); Credeur v. Luke, 362 So.2d 1175 (La.App. 3rd Cir. 1978) reversed 368 So.2d 1030 (La.1979) and Mauterer v. Associated Indemnity Corp., 332 So.2d 570 (La.App. 4th Cir. 1976). On rehearing, we have now concluded that the circumstances of this case call for the application of Sparkman v. Highway Insurance Company, 266 F.Supp. 197 (W.D.La.1967) and the cases which follow it, or independently espouse the same principle for which Sparkman stands. The court has been furnished excellent and exhaustive briefs by counsel relative to the subject. We will endeavor to make clear our reasons for the different conclusion arrived at on rehearing and analyze the applicability or non-applicability of the various cases cited to us.
In reconsidering the question in this rehearing we have kept in mind certain general principles relating to the interpretation of insurance contracts which we recently reiterated in Paret v. Louisiana Health Service & Indemnity, 366 So.2d 634 (La.App. 3rd Cir. 1978), writ denied, 369 So.2d 139 (La.1979). There we stated these general principles as follows:
In a suit to recover benefits under a policy, the insurer has the burden of proving facts which limit its liability. Massachusetts Protective Ass'n v. Ferguson, 168 La. 271, 121 So. 863 (1929). Construction of unambiguous terms in a policy is a matter of law rather than fact, and any exclusion from coverage must be clear and unmistakable. Jones v. Standard Life and Accident Insurance Co., 115 So.2d 630 (La.App. 2nd Cir. 1959) writ denied. If more than one interpretation of an exclusion is reasonable, the one affording coverage to the insured will be adopted.
Our holding on first hearing was primarily based on Heiser v. Gibson, supra, and particularly the language of the court which stated that applicability of the automobile exclusion provision of the comprehensive general liability policy involved there "turns on the source of the injury, not on the theory of legal liability." In now finding that Sparkman rather than Heiser governs (as will be explained later in this opinion), we also conclude that the two cases are not in conflict but are in harmony. The different conclusions in the two cases result from the fact that each case presents different circumstances which are not at all parallel.
It is first appropriate to discuss the policy provisions. Market Insurance Company furnished to Pelican Truck Lines, Inc., a comprehensive general liability policy of insurance. Liability coverage was afforded by the policy to executive officers of Pelican which included defendant, W. E. "Coon" Deville. The pertinent and critical provisions of the policy are these:
Exclusions
This insurance does not apply:
* * * * * *
(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
(1) any automobile or aircraft owned or operated by or rented or loaned to any insured, or
(2) any other automobile or aircraft operated by any person in the course of his employment by any insured; ...
Under the section on "Definitions," and "automobile" is defined as *820 ... a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment; ....
In the section on "Definitions," "mobile equipment" is defined as
... a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled,
(1) not subject to motor vehicle registration, or
(2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or
(3) designed for use principally off public roads, or
(4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment; ....

HEISER v. GIBSON
In Heiser, the plaintiff (Frank Heiser) sued executive officers of his employer. The executive officers brought third party claims against the employer's insurer which insured the employer against both manufacturers' and contractors' liability and automobile liability. The executive officers also sued the employer's insurance agents who had obtained the coverage. The executive officers and the insurance agents claimed that the manufacturers' and contractors' liability policy applied. Heiser claimed he sustained injuries while riding in a company truck which collided with another vehicle. The court stated: "The theory of liability is novel: these company officials should be held personally liable because they forced the driver of the truck to work so long and so hard that the accident ensued."
District Judge Alvin B. Rubin held that the policy in question did not apply because coverage was excluded by the automobile exclusion clause.
The MCL policy specifically excludes "bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of .. [a]ny automobile ... owned or operated by or rented to the named insured..." There is no doubt that the vehicle involved was a company vehicle. The executive officer defendants argue that the exclusion is inapplicable because the negligence alleged has nothing to do with the "ownership, maintenance, operation, use, loading or unloading" of an automobile. They urge that the accident "arose," in a legal sense, out of their own alleged negligence as supervisors.
But the theory of liability upon which a plaintiff chooses to base his action is irrelevant to the application of the exclusion by its express terms. The exclusion turns on the source of the injury, not the theory of legal liability. If the injury "arises out of" the use or operation of an automobile, then the exclusionary language forecloses coverage.
In Credeur v. Luke, supra, we held that the coverage for executive officers under a comprehensive general liability policy was excluded. The injured party was an employee injured while cleaning out the inside of a tank truck belonging to the employer. In the Mauterer case the Fourth Circuit Court of Appeal held coverage of executive officers was excluded where the accident arose out of failure of a stanchion on a flat bed truck that was being loaded with heavy steel pipe.
In Heiser the accident arose out of the operation of a vehicle which collided with another vehicle; in Credeur the accident arose during the maintenance or use of the tank truck. In Mauterer the accident arose out of the loading of a flat bed truck. In each of these cases the activity out of which the accident arose was within the wording *821 of an "automobile exception" in a comprehensive general liability policy, i. e., ownership, maintenance, operation, use, loading or unloading of an automobile.

SPARKMAN v. HIGHWAY INSURANCE COMPANY
In contrast with the Heiser case, the Sparkman case presents facts much more analogous to those presented here by the claim of B. J. Lucas against Market Insurance Company and W. E. Deville. Sparkman was written by Chief Judge Ben C. Dawkins, Jr. The case also involved an "automobile exclusion" in a comprehensive general liability policy.
In Sparkman a judgment had been rendered against Robert E. Hughes who operated an oil well deparaffining and electrical concern. Highways Insurance Company issued to Hughes a contractor's comprehensive general liability policy. The judgment in favor of plaintiff Sparkman was granted in a Texas federal court, and Sparkman brought suit in the Federal District Court for the Western District of Louisiana against Hughes, the insured, and Highways, the insurer. The question before the court (Judge Dawkins) was whether the comprehensive general liability policy provided coverage for the accident in which plaintiff was injured. The facts of the case were quite similar to those before us.
Plaintiff Sparkman was employed by Longwood Construction Company in oil field construction and service work. In changing out a pump at a well site it was necessary to pull rods that operated the pump at the bottom of the well. In the process a hoisting device was required. Hughes was called upon to provide the service for which he dispatched a truck and driver, Reynolds, to the well site.
Upon arrival, Reynolds backed the truck up to the well, set the brakes and disengaged the transmission. He then engaged the winch and remained in the cab to operate it by manipulation of the clutch, accelerator and winch gear. Plaintiff stood behind the truck in a position from which he could direct Reynolds in handling the controls.
The winch cable was attached to the pipe, the pipe was untelescoped and lowered to the ground where repairs to the scoping cable were completed. Then the pipe was raised by the winch to be retelescoped. However, when the pipe was about to be retelescoped, it suddenly fell and struck plaintiff causing his injuries.
During this operation the truck did not, and could not, move.
The policy provisions which Judge Dawkins was required to construe were set forth in his opinion as follows:
This policy does not apply: * * *
(c) * * * to the ownership, maintenance, operation, use, loading or unloading of * * * (2) automobiles if the accident occurs away from such premises [rented to, owned or controlled by the insured] or the ways immediately adjoining * * *.
(b) Automobile. The word `automobile' means a land motor vehicle, trailer or semitrailer, provided: * * *
(2) the following described equipment shall be deemed an automobile while towed by or carried on an automobile as above defined solely for purposes of transportation while being operated solely for locomotion, but not otherwise: if of the non-crawler type, any power crane * * *
In Sparkman the coverage question and the interpretation of the policy were exhaustively considered over some seven pages of the reported opinion (pages 201-207). Three experts with high qualifications and considerable experience in the insurance industry testified concerning the coverage question. Each of the experts classified the hoisting apparatus as a crane and were of the opinion that the accident fell within the terms of the comprehensive general liability policy. A highly qualified expert testified on behalf of Highway Insurance Company against coverage, but the court rejected this expert's opinion because of his failure to "address himself to the key question as to the meaning of `crane' and `automobile' when considered in the inextricable *822 context of `transportation' and `locomotion'." Concerning the testimony of the three experts first mentioned, Judge Dawkins had this to say:
The views of these three experts were essentially in accord and may be summarized as follows: The CGL policy generally covers losses arising out of operations and conduct of a business as distinguished from ownership, maintenance or use of an automobile. The same definition of "automobile" is used in both CGL and comprehensive automobile policies. The definition is for purposes of exclusion in the former and inclusion in the latter. As the two policies relate to automobiles, they are mutually exclusive.
When asked whether any uncertainty or ambiguity existed in the definition of "automobile" in the policies, all three experts agreed that there was much uncertainty and ambiguity in the definition among members of the insurance industry. Exhibit P-20, pages C-2 and C-3 of a Fire, Casualty and Surety Bulletin, was shown to these experts and it contained a warning about the uncertainty inherent in the definition of "automobile." The Bulletin further cautioned agents that to avoid difficulties which could be produced by the ambiguous definition, an insured should be provided with both automobile and CGL policies written by the same company.

Judge Dawkins' analysis is contained in the following portions of his opinion.
Upon careful analysis, therefore, the pertinent questions for our resolution may be specifically delineated in the following manner:
(1) Is the policy exclusion so ambiguous and uncertain as to allow invocation of the Louisiana rule providing for strict construction against the insurance company?
(2) If so, has the insurer successfully carried its burden of establishing that it was relieved from liability and should the rule expressed in (1), above, prevail in favor of plaintiff and Hughes?
* * * * * *
(1)
Initially, we must note that we are dealing here with an exclusionary clause in an insurance contract. Therefore, it is universally held that exclusions are to be strictly construed and that the insurer bears the burden of proving and establishing applicability of the exclusion. Ambiguities must be resolved in favor of the insured. Additionally, at the heart of the issues is whether the hoisting apparatus can be considered an "automobile" at the time of the accident;the issue is not as to the meaning of the words "operation," "use," or "loading or unloading." With reference to this issue, plaintiff's experts agreed that the definition of "automobile" in this policy had been the subject of confusion for a number of years. As heretofore noted, the area was in such a state of confusion that agents and underwriters were advised by the Fire, Casualty and Surety Bulletins to circumvent the problem by providing their clients with both CGL and automobile liability policies issued by the same company. For these reasons, we disregard Highway Insurance's objection to use of the strict construction rule because of the well-known meanings of the words "operation," "use," "loading" and "unloading" as being inapposite to the facts of this case. The cases cited and relied upon were concerned with application of definitions of the words "operation," "use," and "loading or unloading"not with definition of the word "automobile" which is the real ambiguity in the present policy.
(2)
In attempting to sustain the heavy task of establishing relief from liability, the insurer premises its attack upon the mutual exclusiveness of CGL and automobile policies. It reasons that because the policies are said to be mutually exclusive, rules governing definition of "use" in automobile policies are dispositive of the instant case. Thus it argues that if cases *823 are found which hold that operation of a winch by use of a truck's motor and transmission constitute "use" within the meaning of automobile liability policies, then the concept of mutual exclusiveness demands a conclusion that no coverage exists under the CGL policy. We disagree.
We disagree because we find fault in this seemingly logical argument, which actually is specious. As set forth in automobile liability policies, "use" is a word of art. It is given a broad, general and comprehensive meaning so as to effect the intended wide coverage of the automobile liability policy. For example, Highway Insurance cites Fidelity & Cas. Co. of N. Y. v. Lott [273 F.2d 500 (5th Cir. 1960)] in its mutual exclusiveness argument to show the broad meaning of the word "use." In that case, the insured and his three hunting companions were in his automobile driving along the highway. Sighting a deer, the insured stopped the car, got out, rested his rifle across the top and fired. For some unknown reason, the bullet from his rifle went through the roof of his car and killed one of his companions. With only an automobile liability policy before it, the court held that the clause "arising out of the * * * use of the automobile" afforded coverage.
To expose the syllogistic nature of Highway Insurance's argument, we will consider Lott in light of the facts of the instant case. Let us assume that the insured in Lott, as here, had no automobile liability insurance, but did have personal liability insurance. Of course, personal liability insurance excludes risks "arising out of the * * * use of an automobile." And, needless to say, personal liability and automobile liability insurance are mutually exclusive at least insofar as they relate to use of an automobile. In a Lott situation, could the personal liability insurer successfully argue that the risk arose out of the use of an automobile and was therefore excluded from personal liability coverage? We hardly see how. This would be indeed a veritable non sequitur.

Thus it seems clear that this case must be decided by pragmatic rather than legalistic interpretation of the insurance policy before us instead of by merely applying the concept of mutual exclusiveness through judicial pronouncement of the meaning of "use."
Here, plaintiff and Hughes concede that the Hughes truck, when considered as a means of transportation or locomotion, was indeed an automobile within the terms of the policy. However, they contend that at the time of the accident, the special equipment attached to the Hughes vehicle was not an "automobile" under the policy, during the operation in which plaintiff was injured. Plaintiff and Hughes argue that an A-frame and winch powered by the truck's motor are essentially the same as the non-crawler power crane listed as one type of equipment which shall be deemed an automobile only when used solely for purposes of locomotion or transportation.

In light of the circumstances of this case, we think that their argument compels resolution of the issue in their favor. Considering that under Louisiana law where an exclusionary clause is reasonably suspectible of different meanings, the one most favorable to the insured must be adopted, we conclude that the meaning affording coverage must be controlling. Actually, it seems clear that plaintiff and Hughes should prevail even without assistance from the Louisiana strict construction rule. Here the accident occurred off the highway at a well site while the Hughes truck was stationary, and its gears set so that locomotion or transportation was impossible. The hoisting apparatus was performing an operation for which it was designed, and the operation was one which reasonably must have been contemplated for coverage by Highway Insurance and Hughes at the time of confection of the CGL insurance contract. The risk caused by operation of the hoisting apparatus was not a transportation or locomotion hazard which *824 would reasonably call for application of automobile liability insurance. On the contrary, operation of this equipment was a hazard of Hughes' business which created the risk and need for a CGL policy. Since the "power crane" was not in process of locomotion or transportation, it clearly was not an "automobile," within the meaning of the exclusionary clause at the time of the accident.
We believe this conclusion to be solidly supported by the following decisions: Citizens Casualty Company of New York v. L. C. Jones Trucking Co., Inc., (10 Cir. 1956), 238 F.2d 369; Pennsylvania Threshermen and Farmers Mutual Casualty Insurance Company v. Shirer (1961) 224 Md. 530, 168 A.2d 525; Smedley v. Milwaukee Insurance Company (1961) 12 Wis.2d 460, 107 N.W.2d 625; Norton v. Huisman (1962) 17 Wis.2d 296, 116 N.W.2d 169; Neumann v. Wisconsin Natural Gas Company (1965) 27 Wis.2d 410, 134 N.W.2d 474; cf. Liberty Mutual Insurance Company v. Dooley Electric Company (Sup.1954) 133 N.Y.S.2d 785.
The cases cited in the last paragraph of Judge Dawkin's opinion, quoted above, support his analysis.[2]
After considering the authorities above mentioned we are of the opinion that the resolution of this case lies not in the meaning of the traditional words "maintenance," "operation," "use," "loading or unloading". Rather, the resolution lies in the answer to the question of whether the equipment which failed, causing the injuries of B. J. Lucas, was an "automobile", or at least, whether there is ambiguity about the matter which, therefore, runs in plaintiff's favor. The Sparkman case, and many others cited, involved the case of cranes for hoisting. We regard the gin-pole apparatus on the Deville truck as being essentially the same as a crane.[3] Its principal use is for hoisting or pulling. The utilization being made of the gin-pole apparatus at the time of the accident in which Lucas was injured is similar to that of hoisting.
We think the distinction made in the Sparkman case and others is valid and is a common sense interpretation. We are impressed with the analysis which draws a distinction between a transportation or locomotion hazard on the one hand, and an operational hazard on the other. The former would reasonably call for application of automobile liability insurance. With respect to circumstances such as those present in Heiser, involving accidents occurring during locomotion on highways, the automobile exclusion in comprehensive general liability policies is properly invoked to eliminate coverage.
Market Insurance Company urges that Sparkman does not apply in this case because the language of the policy construed in Sparkman is different from the language *825 of Market's policy. The Sparkman policy language, to which Market Insurance Company refers, is the following:
This policy does not apply: * * *
(c) * * * to the ownership, maintenance, operation, use, loading or unloading of * * * (2) automobiles * * *
(b) Automobile. The word automobile means a land motor vehicle, trailer or semi-trailer, provided: * * *
(2) the following described equipment shall be deemed an automobile while towed by or carried on an automobile as above defined solely for the purposes of transportation while being operated solely for the purpose of locomotion, but not otherwise; if of the non-crawler type, any power crane * * * [Emphasis supplied]
Market Insurance Company urges that a distinction exists because the Sparkman policy distinguishes between "locomotion" and non-locomotive use of the equipment involved in Sparkman, a power crane. However, we do not so interpret the language. In our opinion paragraphs (c) and (b) in the quoted language constitute an automobile exclusion clause (for appropriate situations), but the language in (2) is coverage language, which merely states that automobile liability coverage does exist any time mobile equipment is being transported, towed or operated for the purpose of locomotion. The language in paragraph (2) in no way makes the policy in Sparkman different from the Market policy in this case in a context where transportation or locomotion are not involved.
Market Insurance Company further argues that "the issue is whether the gin-pole and the winch removed the truck from the genus of `automobile' and into the genus of `mobile equipment,' under the terms of the policy." Market points out that its policy definition of automobile states that `automobile' means a land motor vehicle, or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment ...". Market then points out that the definition of "mobile equipment" states that mobile equipment is a land vehicle (including any machinery or apparatus attached thereto) under any one of four circumstances, that is, when the vehicle is:
(1) not subject to motor vehicle registration, or
(2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or
(3) designed for use principally off public roads, or
(4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment ....
Market Insurance Company argues that the gin-pole apparatus and winch do not meet any one of these four criteria. To begin with it is our impression that this definition of mobile equipment was confected primarily with automobile liability insurance policies in mind. Since automobile and comprehensive general liability policies are written to be mutually exclusive, the same definitions are utilized in both types of policies. However, the language employed in defining mobile equipment is used principally for the purpose of assuring that automobile liability coverage under automobile policies is not afforded for land vehicles of the type customarily operating on private premises and off public roads. In the reverse situation (where a registered vehicle leaves the highway and departs from its transportational or locomotive role), there is no reason for a restrictive interpretation to be given to these four criteria. Hoisting apparatus attached to a truck with power *826 supplied by the truck, or independently, are designed to function both on highways (to move from one place to another) and off the highways (where they perform special functions not associated with transportational or locomotive functions).
Therefore, while the same definitions of mobile equipment may be employed in both automobile and general liability policies, there is no need to regard such employment as requiring restrictive application of the definition in an off-highway non-locomotive situation. Indeed to do so would result in no coverage at all for occurrences which take place in off-public road type circumstances (such as here), for certainly an insured in such circumstances could not be liable under an automobile policy, and under Market's argument could not be held under a comprehensive general liability policy. Under the Sparkman analysis, and the other cases standing for the same proposition, we are of the opinion that Market Insurance Company's argument for restrictive interpretation of the term "mobile equipment" is untenable.[4]
Market Insurance Company has cited to us, a case from this circuit, Foster v. United Equitable Insurance Company, 204 So.2d 659 (La.App. 3rd Cir. 1967). We do not regard that case as being apposite at all. It involved an accidental death policy which did not present any such issues or insurance provision to be interpreted such as we have here. In any event, we find support in a more recent case from this circuit, Johns v. State Farm Fire & Casualty Co., 349 So.2d 481 (La.App. 3rd Cir. 1977), in which liability under a homeowner's insurance policy was sought to be imposed. The homeowner's policy contained an exclusion of bodily injury arising out of the ownership, maintenance, operation, use, loading or unloading of "any motor vehicle owned or operated by, or rented or loaned to any insured; but this [exclusion] does not apply to bodily injury or property damage occurring on the residence premises if the motor vehicle is not subject to motor vehicle registration because it is used exclusively on the residence premises or kept in dead storage on the residence premises; ...".
In the Johns case plaintiff was hurt while assisting in removing a dead limb from a pine tree. The tree was located on the premises of the insured, Kenneth Allen. A rope was thrown over a limb just below the dead limb which was approximately 35 feet above the ground. One end of the rope was fastened around Johns' waist, and the other end was tied to the bumper of Allen's Ford pickup truck. There was no attempt to hoist Johns upward into the tree by use of the pickup truck, but Allen's son, Kenneth, Jr., was to move the truck forward while Johns climbed the tree, so as to keep the rope taut. Therefore, the rope functioned as a safety line. As Johns moved upward Allen's son was instructed to move the truck forward to take up the slack in the rope. In the process, the rope broke when Johns had ascended 30 feet into the tree, and he fell from that height to the ground, sustaining serious injuries.
We quote the very thorough discussion of the issues in the Johns case, as written by Judge Guidry, inasmuch as we consider them quite apropos to the arguments advanced by defendant Market Insurance Company.
In resolving the issue herein, i. e., whether the quoted clause in State Farm's policy excludes coverage, we note that in Fertitta v. Palmer, 252 La. 336, 211 So.2d 282 (1968), the Supreme Court referred to the "common sense" approach in determining whether the negligent act which caused the injury was a natural and reasonable consequence of the use of the vehicle, within the contemplation of the parties negotiating the insurance contract. As set forth in Bruno v. Hartford Accident & Indemnity Co., 337 So.2d 241 (La.App. 3rd Cir. 1976), the test to be applied for this determination is two-fold:
"(1) was the vehicle being used at the time of the accident; and
*827 (2) was the use thereof directly connected with or a cause of the ensuing accident."
Clearly there must not only be a use of the vehicle but there must also be some connexity between the use of the vehicle and the resulting accident. Ramsey v. Continental Insurance Company, 286 So.2d 371 (La.App. 2nd Cir. 1973), writs refused December 19, 1973, La., 287 So.2d 187.
In Tillman v. Canal Insurance Co., 305 So.2d 602 (La.App. 1st Cir. 1974), writs refused February 7, 1975, La., 307 So.2d 630, the driver of a tractor-trailer unit was killed when his unit went out of control after striking a three foot pile of gravel in its lane of travel. The evidence established that defendant's truck had negligently spilled the gravel on the highway some few hours before the accident. The court in Tillman, supra, found that the gravel company's negligence did not arise out of the use of the gravel truck, but rather out of the driver's intervening negligence in leaving the gravel where it spilled, and thus insurance coverage was provided by general comprehensive provisions of its policy rather than the automobile liability provisions. The court in so finding stated at page 609:
"The courts of this State have interpreted these policy provisions on a number of occasions. We feel it is not necessary to discuss, distinguish or analyze each case. Neither do we feel that any set of rules or tests can be applied to make the clause applicable or inapplicable. It is the best procedure to give the term "use" a reasonable common sense application to the facts of the case with which we are concerned.
We must reject the defendant's contention for the reason that it was not the use or operation of the truck that caused the damage to plaintiff. It was the intervening act of negligence of the driver, apart from the operation and use of the truck, that set in motion the harm which came to Mr. Tillman. By the truck driver negligently leaving the spilled gravel on the highway unattended, the hazard unmarked and the motoring public not warned, a cause of action arose for recovery of damages. There is no connexity between the vehicle from which the gravel was spilled and the failure to protect the motoring public. For these reasons, we find that the negligent act which gave rise to the cause of action for the wrongful death of Mr. Tillman did not arise out of the "use" of the automobile within the terms of the comprehensive automobile liability coverage of Fireman's Fund policy, and that coverage applicable herein is under the comprehensive general liability feature of the policy."
Furthermore, we note that in Hurston v. Dufour, 292 So.2d 733 (La.App. 1st Cir. 1974), writs refused June 7, 1974, La., 295 So.2d 178, our brethren of the First Circuit therein recognized the soundness of the legal proposition espoused in State Farm Mutual Automobile Insurance Company v. Partridge, 10 Cal.3d 94, 109 Cal. Rptr. 811, 514 P.2d 123, to the effect that if liability arises from two sources, namely a non-auto related incident as well as an auto related occurrence, the mere fact that one source is excluded under the homeowners policy does not render the homeowners coverage ineffective if the other source of liability is included thereunder. The court in Hurston, supra, page 740, stated:
"In Partridge, above, the insured carried an automobile liability policy and a homeowners policy with his insurer, State Farm. A guest passenger in Partridge's hunting vehicle was injured when Partridge's hand gun, being carried therein, discharged accidentally. The weapon fired when Partridge drove his vehicle off a road in pursuit of game. The insurer brought an action to determine whether the automobile liability policy or homeowners policy covered the incident. In essence, the court found Partridge liable for the negligent handling of a firearm, which risk was within the coverage of the homeowners policy which generally *828 protected the policy holder from non-auto related accidents. The court concluded that if liability arises from two sources, namely, a non-auto related incident as well as an auto-related occurrence, the mere fact that one source is excluded under the homeowners policy does not render the homeowner's coverage ineffective if the other source of liability is included thereunder. So finding, the court held coverage was afforded the insured both under the automobile liability policy and the homeowners policy.
Our jurisprudence is established to the effect that decisions of other jurisdictions are persuasive and will be considered in disposing of issues res nova in our own courts, but are not controlling. Roux v. New Orleans Police Department, La.App., 223 So.2d 905. We readily acknowledge the soundness of Partridge, above, under the factual situation presented therein ..."
A review of plaintiff's petition in this matter reveals that petitioner seeks recovery not only for the alleged negligent acts of Kenneth Allen, Jr. in failing to properly operate the vehicle but also for certain alleged negligent acts of Kenneth Allen, Sr. unrelated to the operation or use of the vehicle. In this latter connection the plaintiff's petition alleges that Kenneth Allen, Sr. was negligent in the following regard:
1. In failing to observe petitioner climb the tree;
2. In failing to properly supervise the tree climbing operation;
3. In failing to properly instruct both petitioner and Kenneth Allen, Jr. as to the dangers of the tree-climbing operation; and,
4. In failing to exercise due care under the existing circumstances.
Clearly plaintiff's petition charges Kenneth Allen, Sr. with acts of negligence which are completely independent of and totally unrelated to his ownership and use of the vehicle herein involved. Following the reasoning of Tillman, supra and Partridge, supra, if it be determined that Kenneth Allen, Sr. was guilty of these alleged acts of negligence which are independent of and unconnected with the use of the vehicle then the insurance coverage applicable would be under Allen Sr.'s homeowner's policy. This being so we cannot agree with the trial court's conclusion that no genuine issue of material fact exists herein and that the defendant State Farm is entitled to judgment as a matter of law.
In addition to the Johns case we rely on LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978) decided by our Supreme Court. That case involved a law enforcement officer's professional liability policy issued by Western World Insurance Company. The claim in LeJeune arose out of a collision at an intersection through which a funeral cortege was moving. A deputy sheriff was charged with negligence in failing to secure the intersection. The Supreme Court held there was no liability under an automobile policy because the deputy's liability did not arise out of his "use" of the sheriff's vehicle. The deputy's negligence consisted of his failure to supercede the automatic signal at the intersection and warn traffic on the highway having the right of way of the approaching funeral procession. The sheriff's office had two types of insurance coverage: (1) a law enforcement officers professional liability policy, issued by Western World Insurance Company, and (2) a basic combination automobile policy, issued by Dixie Auto Insurance Company. Dixie, the auto insurer, was held not liable under its policy, but Western World was held liable under its policy. The Supreme Court made these pronouncements which we consider pertinent:
Western World's policy clearly applied, unless the coverage of Deputy Smith's negligence is excluded by a clause that the policy does not apply "to bodily injury arising out of the ownership, operation, or use, loading or unloading, of land motor vehicles."
An exclusion clause in a liability policy is strictly construed against the insurer *829 and in favor of coverage, if more than one interpretation is possible. Creole Explorations, Inc. v. Underwriter's at Lloyd's of London, 245 La. 927, 161 So.2d 768 (1964); Stanley v. Cryer Drilling Co., 213 La. 980, 36 So.2d 9 (1948); Couch on Insurance 2d, Section 44:414 (1964). Consonant with this principle, the decisions we could find hold that, where the automobile use exclusion clause is sought to be applied so as to avoid coverage for injuries otherwise covered by a general liability policy, the exclusion clause does not apply where the insured's act is a result of negligence independent of, even though concurring with, his use of an automobile. State Farm Mutual Automobile Insurance Co. v. Partridge, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973); United States Fidelity & Guaranty Co. v. Breslin, 243 Ky. 734, 49 S.W.2d 1011 (1932); Assurance Company of North America, 108 Ga.App. 766, 134 S.E.2d 540 (1963); Couch, cited above, Section 44:532.
Accordingly, the exclusion clause in Western World's policy does not operate to exclude coverage of Deputy Smith's negligence leading up to the collision. Although he could and should have used his police car to block the intersection and warn approaching drivers of the dangerous situation, it was not any use or abuse of his vehicle itself that led to his liability. Rather, it was his failure to supersede the automatic traffic signal and warn traffic approaching on the right-of-way highway that a funeral procession was going to pass through it, a function of his duties as law enforcement officer.
The basis of Deputy Smith's liability is his negligent failure to perform this law enforcement duty, the risk specifically insured by Western World's policy. The circumstance that the deputy was to use his automobile in the performance of this duty was incidental to the breach of this law enforcement duty. His liability is not based upon the negligent use of his vehicle, but rather upon his negligence in failing to secure the intersection so as to alert approaching traffic of the danger involved. The damages to the injured victim arose out of the deputy's breach of his law enforcement duties, not from the deputy's use of his automobile.
Defendant, Market Insurance Company, has cited us to several cases holding that a vehicle which was stationary when an accident occurred does not render inapplicable the "ownership, maintenance or use" clause. Some of these cases involve automobile or truck liability policies and would not be authoritative for a number of reasons discussed above. Particularly pertinent would be our comments concerning the different applications of such terms in comprehensive general liability policies. We refer to defendants' citation of Wiedenhaupt v. Vander Loop, 5 Wis.2d 311, 92 N.W.2d 815 (1958); Christian v. Royal Insurance Company, 185 Minn. 180, 240 N.W. 365 (1932); Oklahoma Farm Bureau Mutual Ins. Company v. Mouse, 268 P.2d 886 (Okl.1953) and Truck Insurance Exchange v. Transamerica Insurance Company, 28 Cal.App.3d 787, 104 Cal.Rptr. 893 (1972); North River Insurance Company v. Pomerantz, 492 S.W.2d 312 (Tex.Civ.App.1973) probably falls in the same category. Hardware Mutual Casualty Company v. Curry, 21 Ill.App.2d 343, 157 N.E.2d 793 (1959) construes a general liability policy. It appears to lend support to the position of Market Insurance Company. However, the facts of the case are quite similar to the facts of those of Sparkman v. Highway Insurance Company, supra, and we consider the Sparkman case to be a better reasoned case.
From what we have said it also follows that the Louisiana cases of Credeur v. Luke, supra, and Mauterer v. Associated Indemnity Corporation, supra, cited in our opinion on original hearing are not controlling.

"USE" OF DEVILLE'S TRUCK AS A COUNTERWEIGHT
One issue has not been raised by the parties. Before concluding we will address that problem. In a real sense it may be said that the Deville truck was being used by W. E. Deville at the time of the accident. In Deville's scheme of operation the weight *830 of the truck was being used to counterbalance the weight of the cement bin. It was assumed that the weight of the truck was greater than that of the bin. Had this been the case, and had the cable not snapped, the truck which Lucas was actually operating would have counter balanced the bin. As we know, the weight of the bin had not been accurately determined and the accident occurred. Assuming, therefore, that some actual use of the gin-pole truck was being made within the contemplation of the words "ownership, operation, maintenance, use," etc. the principle stated in the LeJeune, Johns, and other cases discussed, would apply.
In LeJeune the Louisiana Supreme Court stated, "where the automobile use exclusion clause is sought to be applied so as to avoid coverage for injuries otherwise covered by a general liability policy, the exclusion clause does not apply where the insured's act is a result of negligence independent of, even though concurring with, the use of the automobile." Hence, any use of the Deville truck would not result in avoiding coverage through the automobile exclusion clause.

CONCLUSION
For the reasons assigned, we were in error in our opinion on original hearing wherein we held Market Insurance Company was not liable in this case to plaintiff, B. J. Lucas, under its policy of comprehensive liability insurance. We now hold that Market Insurance Company was liable insolido with its insured, W. E. Deville.
We now recall and set aside our decree rendered on original hearing. For the foregoing reasons it is now ordered and decreed that there be judgment in favor of plaintiff, B. J. Lucas, and against defendant, W. E. "Coon" Deville and Market Insurance Company, insolido, in the full sum of $335,222.15, together with judicial interest from date of demand until paid, and for all costs of these proceedings, including the costs of this appeal, the liability of Market Insurance Company to be restricted to the limits of liability provided in its policy, namely $300,000.00, and further subject to any deductible amounts which may be applicable.
CULPEPPER, J., having dissented as to liability does not reach the issue of insurance coverage.
GUIDRY, J., does not reach the issue of coverage for the reasons assigned by CULPEPPER, J.
NOTES
[1] Plaintiff-appellant's cause of action arose August 6, 1976, which was prior to the effective date of Act 147 of the 1976 Regular Session of the Louisiana Legislature which amended LSA-R.S. 23:1032 and 23:1101. The statute is not retroactive. Bostic v. International Minerals & Chemical Corp., 360 So.2d 898 (La.App. 2nd Cir. 1978) and cases therein cited, including this circuit's case of Billedeaux v. Adams, 355 So.2d 1345 (La.App. 3rd Cir. 1978).
[2] In Credeur v. Luke, supra, a single policy of insurance was involved. The one policy incorporated provisions for comprehensive general liability and comprehensive automobile liability insurance. The reversal of the Credeur case by the Louisiana Supreme Court was based solely on its interpretation of the automobile liability features of the policy. Therefore, the expressions of this Court of Appeal pertaining to the general liability provisions of the policy in question remain valid.
[3] This testimony was allowed by the trial court over objection by the defense that testimony by plaintiff as to what Dr. Dodson had said to him was hearsay. Counsel for plaintiff urged that the testimony offered was to counter the argument of the defense that plaintiff should mitigate his damages by undergoing the surgery. In this regard, it was urged that the testimony was necessary to show plaintiff's state of mind and the circumstances supporting his state of mind. Therefore, so it was urged, the testimony was not hearsay because it was not offered to prove the truth of the statements attributed to Dr. Dodson. On the basis of this argument, the trial court permitted plaintiff to testify. Tr. 471-472.
[1] Both plaintiff, B. J. Lucas, and defendant, W. E. "Coon" Deville, urge that Market Insurance Company, affords liability insurance coverage to Deville.
[2] Counsel cited us to numerous other cases: Mission Insurance Co. v. Barnett, 476 F.Supp. 925 (S.D.Ala.1979); Commercial Union Assurance Co. v. Aetna Casualty & Surety Co., 455 F.Supp. 1190 (D.H.H.1978); State Farm Mutual Automobile Insurance Co. v. Farmers Insurance Group, 569 P.2d 1260 (Wyo.1977); Home Indemnity Co. v. Transport Indemnity Co., 69 Cal.Rptr. 504, 263 Cal.App.2d 100 (Cal.App.3d Dist.1968); Donahue Construction Co. v. Transport Indemnity Co., 7 Cal.App.3d 291, 86 Cal.Rptr. 632 (1970); Industrial Indemnity Co. v. General Insurance Co., 210 Cal.App.2d 352, 26 Cal.Rptr. 568 (1962); Parent v. U.S.F. & G., 233 A.2d 455 (1967); Aetna Insurance Co. of Hartford v. Kent, 12 Wash.App. 442, 530 P.2d 672 (1975); Tillman v. Canal Insurance Co., 305 So.2d 602 (La.App.1st Cir. 1974), writ refused 307 So.2d 630 (La.1975); State Farm Mutual Automobile Insurance Co. v. Farmers Insurance Group, 569 P.2d 1260 (Wyo.,1977).
[3] Cf. Lucas v. Insurance Co. of North America, 342 So.2d 591 (La.1977) in which the Louisiana Supreme Court stated the following:

The work of truck drivers, whether road-trucks or gin-pole trucks, in the oilfield industry frequently requires twelve-hour days and sixty-hour weeks, as well as the driver's availability at any time of day or night to perform the hauling and location duties of the occupation. However, the operator of a gin-pole truck primarily performs "location" work, with his truck serving as a sort of mobile crane by which to load and unload heavy equipment upon itself and for other purposes. Even more than the driver of a road-truck, the driver of a gin-pole truck has frequent intervals of simply waiting at the location in order to perform the specialized work for which his truck is equipped.
[4] Cf. the illustration discussed in Sparkman v. Highway Insurance Company, supra, beginning at the bottom of page 204 of the opinion concerning the case of Fidelity & Casualty Co. of N.Y. v. Lott, 273 F.2d 500 (5 Cir. 1960).