305 So.2d 602 (1974)
Catherine Jenkins TILLMAN, Ind.
v.
CANAL INSURANCE CO. et al.
No. 10013.
Court of Appeal of Louisiana, First Circuit.
November 12, 1974.
Rehearing Denied December 16, 1974.
Writ Refused February 7, 1975.
*603 Roger M. Fritchie, Baton Rouge, for Mr. Mills and Canal Ins. Co.
Henry D. Salassi, Jr., Baton Rouge, for Mr. Thomason & Fireman.
John Dale Powers, Baton Rouge, for defendant-appellee-appellant.
William C. Kaufman, III, Baton Rouge, for appellee.
Before LOTTINGER and COVINGTON, JJ., and BAILES, J. Pro Tem.
BAILES, Judge Pro Tem.
On October 16, 1969, at 3:30 a. m., eight miles south of Clinton, Louisiana, on a straight inclined section of Highway 67, a tractor-trailer unit owned by Sanders Pecan Company, Inc., driven by Leonard C. Mills, and insured by Canal Insurance Company, struck a three foot high pile of gravel in its southbound lane of travel. This tractor-trailer unit went out of control, crossed over to the northbound traffic lane, crashed headon into a pickup truck and killed the driver and sole occupant, Mr. Elzy Tillman, instantly.
The plaintiff, Mrs. Catherine Jenkins Tillman, for herself and on behalf of her minor daughter, Shelia Ann Tillman, filed suit against Sanders Pecan Company, Inc., Leonard C. Mills, Canal Insurance Company, H. Allen Thomason, Southeastern Engineering Company, Inc., d/b/a Southeastern Materials Company, T & T Mc., d/b/a T & T Transport and Fireman's Fund Insurance Company.
The district court, after a lengthy trial, rendered judgment in favor of the plaintiff, individually for the sum of $107,381, and as natural tutrix of her minor child, in the amount of $45,000, in solido, against the defendants named above. These defendants have appealed. The plaintiff has answered the appeal, seeking an increase in quantum. Mrs. Tillman, individually, asks for an increase in the award of $207,381, and a total of $100,000 for the minor.
For the reasons assigned herein, we affirm the judgment of the district court.
Separately filed, but consolidated for trial, were these three connected actions:
Motors Insurance Corporation, et al vs. T & T Inc., d/b/a T & T Transport Company, et al, No. 10014;
Leonard Mills & Wiley Sanders, d/b/a Sanders Pecan Company, Inc., et al vs. H. Allen Thomason, et al, No. 10015; and
Motors Insurance Corporation vs. Wiley Sanders, et al, No. 10016.
Our resolution of the liability issue in the instant suit is dispositive of these companion suits, however, separate judgment will be rendered in each case.
Highway 67, in the vicinity of the accident scene is a two lane blacktopped road with eight foot hard-surfaced shoulders on either side. About 600 to 700 feet north of the place these two vehicles collided, Highway 67 is intersected on the east by Louisiana Highway 959. This latter highway, including other uses, serves as an outlet to Highway 67 for gravel pits east of Highway *604 67 along the Amite River including a pit operated by H. Allen Thomason. South of this intersection, Highway 67 is straight for a considerable distance and traverses generally rolling hill country. Immediately north of the intersection, travelling in a southerly direction, the highway has a 30 to 45 degree curve to the right.
Between midnight, October 15, 1969, and the time of this accident gravel was spilled from Highway 959, through its intersection with Highway 67 and for a distance of 500 to 600 feet in the southbound lane of Highway 67. The spillage, in the beginning was light but progressively became heavier and thicker to the place where it terminated at the three foot high pile. No gravel was found on the highway south of this pile.
The driver of the southbound Sanders vehicle came upon the gravel in his lane at the intersection and proceeded to drive on the gravel until he struck the pile which had been dumped across his lane of traffic.
Mr. Mills, the truck driver, testified that as he approached the intersection of Highway 959 and 67, he was driving with his lights on high beam and had good vision. At the intersection he put his lights on low beam because he saw the reflection of lights of an approaching vehicle. (The Tillman pickup truck). Mr. Mills stated that as he approached the curve he let up on the accelerator. He estimated his speed then at 50 mph. He fixed his speed by the time he reached the intersection at 40 to 45 mph. He testified he saw the gravel on the highway when he reached the intersection. During the interval between encountering the gravel and the striking of the pile his testimony was that he took no action to reduce his speed except the deceleration of the vehicle through lack of fuel. The brakes were not applied because of his avowed fear of the trailer jackknifing. He neither geared down his truck nor pulled over on the shoulder of the road. With his lights on low beam, he fixed the distance of his forward vision at 50 to 60 feet. He claims not to have seen the pile of gravel until he was about 30 feet away. On impact with the pile of gravel, he estimated his speed was between 30 to 40 mph.
The evidence conclusively establishes that the collision occurred on Mr. Tillman's side of the highway. It is Mr. Mill's contention that upon striking the pile of gravel he was catapulted into the sleeper portion of the cab whereupon he had no further control of the truck. Obviously, when he was thrown from his driving position or from the driver's seat he had no longer any control of the vehicle. We are primarily concerned with considering and testing his actions prior to striking the pile of gravel and scrutinizing such action for negligence. At the point in time of striking the pile of gravel, he was powerless to avert the impending collision with Mr. Tillman's vehicle.
One of the latest cases decided by the Supreme Court dealing with the liability of the driver who leaves his own side of the road and collides with an innocent motorist is Simon v. Ford Motor Company et al., La., 282 So.2d 126 (1973). Therein, on page 133 is found the following rule of law:

"2. Ferrington and his liability insurer "With regard to the claim against Ferrington, the driver of the vehicle which suddenly veered from its proper lane across the highway into Simon's lane, the following principle is applicable
"When a driver on his wrong side of the road collides with another car which is in its correct lane of traffic, the driver is required to exculpate himself of any fault, however, slight, contributing to the accident. Rizley v. Cutrer, 232 La. 655, 95 So.2d 139 (1957); Noland v. Liberty Mut. Ins. Co., 232 La. 569, 94 So.2d 671 (1957). See also: Jones v. Continental Cas. Co. of Chicago, 246 La. 921, 169 So.2d 50 (1964); Breaux v. Valin, 138 So.2d 405 (La.App. 3d Cir. 1962) (claim of latent brake failure.)
*605 "In our original majority opinion, we overlooked that the burden of the motorist who leaves his proper lane of the highway to injure a blameless person proceeding properly in the opposite lane is not simply to exculpate himself from ordinary negligence, but from any fault whatsoever."
Herein the Sanders truck driver has not shown his freedom from fault. Any fault, however slight, proximately causing or contributing to the accident will render him liable as a tort-feasor. We find from the driver's own admission he did nothing whatever to reduce the speed of his truck except to remove his foot from the accelerator. It clearly appears that he had at least two options to bring his vehicle under such necessary control as to be able to meet any emergency. He travelled a distance estimated at 500 to 600 feet on the gravel. The proof is clear that the gravel from the intersection of the roads became progressively thicker. Further, the ambulance driver who came speeding to the scene stated that the gravel was so think that he had to drive into the left land in order to reach the victim. The driver, Mills, had the option of driving onto the eight foot hard surfaced shoulder on which according to his own testimony, there was little or no gravel or he could have operated the brakes on the trailer alone to reduce his speed. According to the testimony of a Mr. Thomas, an experienced truck driver, by the operation of the rear most brakes (trailer brakes) first the hazard of the trailer jackknifing would have been eliminated, then the other brakes on the vehicle could have been operated without fear of jackknifing.
Further, the driver testified that with his headlights on low beam his forward vision was from 50 to 60 feet. This lack of illumination of the distance of 150 feet on low beam is in violation of LSA-R.S. 32:321. This statute requires headlights on high beam to illuminate the roadway for a distance of 500 feet ahead and 150 feet ahead on low beam. The driver was negligent in operating his vehicle with such limited vision.
We find that the truck driver has not exculpated himself of fault proximately contributing to the cause of the accident. The negligent operation of the truck was a proximate cause of the accident for which there is liability in damages.
There is no direct evidence before us from which we can determine the origin of the gravel on the highway. Certainly and presumably that quantity of gravel spilled from a gravel hauling truck. The known location, the spread of the gravel, and the quantity of gravel leads us to that conclusion.
There is no direct evidence from which we can determine the identity of the driver who negligently abandoned the gravel, left it unattended, and who failed to take all available means to warn the travelling public of the obstruction. Therefore, our determination of the identity of the person at fault must be made on the probative effect of circumstantial evidence.
Without detailing the testimony from which we make the following findings, suffice it to say that there is direct testimony in the record which proves that defendant, H. Allen Thomason, either individually, or through one of his wholly controlled corporations, was the lessee of a gravel pit and that all gravel hauled from this pit was transported over Louisiana Highway 959; that his pit was in operation on October 15, 1974, and frequently gravel was hauled from his pit at night. Loading equipment, fuel and delivery tickets were available to his drivers at all times; that on the night of October 15, 1974, as late as nine o'clock gravel was hauled from the Thomason pit; further it was established that at sometime during the night of October 15-16, 1974, at least three and maybe four loads of gravel were delivered from the Thomason pit to Tri-City Ready Mix Company at Morgan City, Louisiana. One of the witnesses (Mr. Bogan) who testified to the delivery of this gravel stated that one of the loads *606 delivered by Thomason was not a full load. He could not state to what extent or the quantity that was short.
The highway safety engineer who observed the clean-up operation of the highway and the removal of the gravel testified that at least 11 yards were removed. This gravel was taken to the maintenance unit lot where it was stored in a separate bin.
It was shown that no other pit in this area operated at night.
Pivotal of the question of the identify of the person who abandoned the gravel on the highway is the identification of the source of the gravel. In reaching our conclusion on the identify of the pit from which the gravel came we considered the following:
Mr. Thomason testified that the gravel from his pit was easily identified. He described it as being dirty gravel. To bolster this claim of dirty gravel he further described his gravel as being produced from a dead screen, that is, there was no gradation of his gravel. He produced one type gravel and one type sand. His gravel contained all gradation of C1 through C4. He stated there was no other pit in this area which used a dead screen. Contrasted to the dead screen is the shaker screen which sorts gravel into what in the industry is described as C1, C2 and C3.
Mr. Thomason further testified that he was called to the scene of the accident in the early morning of October 16, 1974. He observed the gravel on the highway. It was his observation that the gravel on the highway was totally C1 and C2 sized gravel. This according to his testimony, clearly established that the gravel did not come from his pit. No other evidence corroborates this statement.
The preponderance of the evidence on the kind or type of gravel conclusively shows that the gravel spilled on the highway was dirty gravel, contained some sand and clay and was not screened for different gradations. From this gravel samples were obtained, as well as samples from the Thomason pit and an adjoining pit known as the Placid pit. These samples were delivered to Professor Ara Arman of LSU, who was qualified as an expert in gravel analysis. He examined, washed and ran gradation tests to determine sizes. This testing procedure was followed on the sample taken from the highway gravel and from the Thomason pit. Profession Arman testified that the gradation tests on the sample from the road and from the Thomason pit were quite similar. Both appeared to be unwashed gravel. His conclusion was that if all the other pits in this area used shakers except one, the tested gravel came from the pit that used no shaker. His test of gravel from the Placid pit showed that it was washed and graded. Further, he testified that from his visual inspection of the samples taken from the Thomason pit and the road, the two samples were alike or at least similar, and that the Placid pit sample was an entirely different material.
Mr. Thomason testified that he had two regular employees at his pit during the daylight hours. These were his brother and another man by the name of Wayne Johnson. Neither of these two individuals were called as witnesses. Their absence was not explained. Also we observe that a driver for Thomason by the name of J. W. Ryder was not called as a witness. His absence was not explained. He was the driver of Truck No. 15, and the activity of that truck during the night of October 15-16, 1969, has not been explained.
When a party fails to call a witness who possesses knowledge of facts pertinent to the resolution of litigation and whose absence is not satisfactorily explained, it is presumed that such witness would testify adverse to that party.
There is no prohibition to the use of circumstantial evidence in establishing any fact. Fundamental in the use of circumstantial *607 evidence, and the weight to be given to it, is the requirement that such evidence, to be sufficient to prove any fact, must exclude, with a fair amount of certainty, every reasonable hypothesis other than that which it tends to prove.
In LeBlanc v. Travelers Insurance Company, La.App., 291 So.2d 817, at page 820, in discussing proof of negligence by circumstantial evidence, the court observed:
"It is true that, with some exceptions not present here, negligence is never presumed and the burden of proving negligence by a preponderance of the evidence rests on the party alleging it. However, negligence may be proved by either direct or circumstantial evidence. Circumstantial evidence is particularly appropriate where, as in the case here, direct evidence is unavailable to a plaintiff. In order for circumstantial evidence to be sufficient, it must exclude, with a fair amount of certainty, every-reasonable hypothesis other than that the damages claimed resulted from the negligence of the defendant. In order to constitute a preponderance, the evidence must show it was more probable than not that the harm was caused by the tortious conduct of the defendant."
In the use of circumstantial evidence such evidence, as in this case, must show it was more probable than not that the harm was caused by the tortious conduct of the defendant. Now discussing the probabilities, when we consider the admitted or known facts and join to this the testimony that on the night before the early morning hours of this accident that the Thomason pit was in operation, that it was open at night, loading equipment was operational, fuel was available, delivery tickets were accessible, the gravel from the highway looked like or was similar to gravel from the Thomason pit, that no other pit produced gravel that looked like the Thomason produced gravel, that gravel was delivered on this night to customers and that the testimony of the absent employees would have been adverse to Thomason, we find it more probable than not that this spilled gravel came from the Thomason pit and that it was spilled from a Thomason truck driven by a Thomason employee. From the evidence before us, we can conceive of no other reasonable hypothesis which would explain the presence of the gravel on the highway.
It is gross negligence to leave spilled gravel on the public highway without taking the necessary precautions to warn of and protect the travelling public from the hazards incident to its presence. Thus, this is actionable negligence which constitutes a proximate cause of the death of Mr. Flzy Tillman for which the Thomason defendants are answerable in damages.
Defendant Fireman's Fund asserts in its brief that the trial court committed error in finding that its liability under the Thomason policy is compensable under the comprehensive general liability insurance feature of the policy, arguing that if there is liability it should be found within the terms of comprehensive automobile liability part. Specifically, its argument is based on paragraph (b) of the exclusions under the comprehensive general liability coverage which states:
"Exclusions
"This insurance does not apply:
"(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
"(1) any automobile or aircraft owned or operated by or rented or loaned to the named insured," *608 and that under the comprehensive automobile liability coverage the following is applicable, namely:
"PART II. COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE
I. COVERAGE CBODILY INJURY LIABILITY
COVERAGE DPROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage C. bodily injury or
Coverage D. property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile, * * *."
Fireman's Fund's limit of liability under the comprehensive automobile liability coverage the limit of liability is $10,000.
Defendant cites the case of Cagle v. Playland Amusement Park, La.App., 202 So.2d 936 (1967), and Baudin v. Traders & General Insurance Co., La.App., 201 So.2d 379 (1967) to buttress its argument that the courts have been very liberal in interpreting the "use" clause of automobile policies to find accidents arising out of the ownership, operation, maintenance or use of motor vehicles. In the Cagle case the court found an amusement park guard was an omnibus insured within the "use" clause and provided coverage for the negligent injury of the vehicle owner who was shot when the guard used his revolver to break the window glass to assist the owner in gaining entrance to the locked vehicle. In the Baudin case, the court found the driver of a borrowed automobile to be an omnibus insured under the "use" clause of an automobile liability insurance policy when the borrower of the car stopped at the curb to tell a child to go home which necessitated the child crossing the street. When the child came from behind the insured vehicle he was struck by a passing vehicle. The court determined that this was a "use" within the terms of the policy as the parking of the car at the curb created a hazardous circumstance for the child in crossing the street.
Defendant also relies on the case of Vogt v. Hotard, La.App., 144 So.2d 714 (1962), and Adams v. Allstate Insurance Company, La.App., 212 So.2d 204 (1968). In the Vogt case the plaintiff was injured when a tree being pulled by the insured vehicle fell the wrong way and struck the plaintiff. The court held this was a "use and operation" of the insured vehicle.
In Adams v. Allstate Insurance Company an automobile was pulling a trailer on which a boat was being towed. The boat fell from the trailer to the highway. The insured was turning around to return to the scene to push the boat out of the highway with his automobile when a passing motorist struck the boat. Defendant argues that applicability of the automobile policy of the automobile pulling the boat was so obvious it was not even argued. The policy of insurance was not before the court, and furthermore the question was never raised by the insurer and the court never passed on the question of coverage.
In Ramsey v. Continental Insurance Company, La.App., 286 So.2d 371 (1973), writs denied La., 287 So.2d 187, plaintiffs sue under the liability provisions of a homeowner's policy to recover damage which arose from the accidental discharge of a firearm. The firearm discharged inside of the automobile when its owner and driver of the vehicle negligently handled the weapon for the purpose of moving it from the front to the rear of the car. The same exclusionary clause is in the homeowner's policy as is found in instant case. The court held that the movement of and the subsequent discharge of the gun did not "arise out of the use" of the automobile nor did it have any connexity with the *609 use of the vehicle, consequently there was coverage.
The courts of this State have interpreted there policy provisions on a number of occasions. We feel it is not necessary to discuss, distinguish or analyze each case. Neither do we feel that any set of rules or tests can be applied to make the clause applicable or inapplicable. It is the best procedure to give the term "use" a reasonable common sense application to the facts of the case with which we are concerned.
We must reject the defendant's contention for the reason that it was not the use or operation of the truck that caused the damage to plaintiff. It was the intervening act of negligence of the driver, apart from the operation and use of the truck, that set in motion the harm which came to Mr. Tillman. By the truck driver negligently leaving the spilled gravel on the highway unattended, the hazard unmarked and the motoring public not warned, a cause of action arose for recovery of damages. There is no connexity between the vehicle from which the gravel was spilled and the failure to protect the motoring public. For these reasons, we find that the negligent act which gave rise to the cause of action for the wrongful death of Mr. Tillman did not arise out of the "use" of the automobile within the terms of the comprehensive automobile liability coverage of Fireman's Fund policy, and that coverage applicable herein is under the comprehensive general liability feature of the policy.
At the time of his death Mr. Tillman was 41 years of age. He had a life expectancy of 31.29 years to age 72.29. According to the testimony of Dr. John W. Chisholm of LSU, who made a study of the economic impact of the death of Mr. Tillman on both his widow and minor daughter, Mr. Tillman had a work life expectancy of 23.2 years or to age 64.2. During the years 1966 he had income of $6,736.82; 1967, $5,638.45; 1968, $7,783.51; and 1969 up to the date of his death, $7,472.54. This gives an average earnings for these four years of $7,416.63, assuming that his earnings for the last 11 weeks of 1969 would have been proportionately equal to the first 41 weeks of 1969 during which he lived. Dr. Chisholm determined that based on his 1969 earnings, including the projection of the expected earnings during the last 11 weeks of 1969, Mr. Tillman to age 64 would have had earnings of $131,403.88 which figure included a gross pay increase of three per cent per year.
The trial court fixed Mrs. Tillman's and her daughter, who was 12 years of age at the time of her father's death, loss of support at the sum of $100,000. Of this amount he allocated $70,000 to Mrs. Tillman and $30,000 to the child. For loss of love and affection the trial court awarded Mrs. Tillman $35,000 and $15,000 to the child.
It has been established impressively in our jurisprudence (McFarland v. Illinois Central Railroad Co., 241 La. 15, 127 So.2d 183 (1961) that the fixing of quantum for the loss of support does not lend itself to a mathematical formula. We do not find that the trial court used a formula in determining the amount of the awards. Formulas can and do serve as check points or guideposts in testing reasonableness.
We determine no unreasonableness in these awards, nor do we find that the trial court abused its much discretion.
It was stipulated that Mr. Tillman's deductible portion of his insurance policy was $100 and that his funeral expenses were $2,281.
As mentioned heretofore, plaintiff has answered the appeal seeking an increase in quantum. Our finding that the award of the trial court was fair, adequate and reasonable forecloses any increase in quantum to the plaintiff.
For the foregoing reasons, the judgment of the trial court is affirmed. Cost of this appeal is to be paid by defendants.
Affirmed.