398 So.2d 1136 (1980)
Doyle MIZELL et al.
v.
The STATE of Louisiana, Through the LOUISIANA DEPARTMENT OF HIGHWAYS et al.
No. 13425.
Court of Appeal of Louisiana, First Circuit.
October 6, 1980.
On Rehearing March 2, 1981.
*1137 L. D. Sledge and Randy Shipp, Baton Rouge, for plaintiff-appellant.
William J. Doran, Jr. and Marshall W. Wroten, Baton Rouge, for Hwy. Dept.
W. Arthur Abercrombie, Jr., Ben Louis Day, Baton Rouge, Richard A. Chopin, New Orleans, James W. Hailey, Jr., Metairie, France W. Watts, III, Franklinton, Duncan S. Kemp, III, Dist. Atty., Tangipahoa Parish, Amite, Lawrence J. Ernst, New Orleans, for defendants-appellees.
R. L. Booty, pro. per.
Jesse LaGarde, Amite, for La.Const.
Before ELLIS, COLE and WATKINS, JJ.
WATKINS, Judge.
This action was brought to obtain damages for severe injuries sustained by Brenda Mizell, Doyle Mizell, and Willie Hodges in a one car accident in which a 1967 Pontiac Bonneville four-door car struck the east bridge abutment of the Tangipahoa River Bridge, east of Amite, Louisiana. Judgment was rendered against the Department of Transportation and Development, State of Louisiana, (hereinafter referred to as "DOTD") in the following amounts for the following plaintiffs:

Willie Hodges $483,706.50
Doyle Mizell 358,944.05
Brenda Mizell 21,019.94
 ___________
 $863,670.49

There were several other defendants, most notably, Travelers Insurance Company, motor vehicle liability insurer of the DOTD's dump trucks (which were alleged to have tracked asphalt on the highway). Travelers was dismissed as a party defendant on a motion for a so-called "directed verdict" (the case was tried without a jury), after plaintiffs' presentation of their case on trial on the merits. Numerous third party demands were filed. With the exceptions set forth above, with regard to the DOTD and Travelers, and other exceptions, no judgment *1138 was rendered either in favor of or against the numerous defendants, and similarly, most of the third party demands were not specifically decided by judgment. No appeals regarding these exceptions and incidental demands have been taken. Thus, we consider the claims of the plaintiffs in chief only, and those only with regard to the judgment in favor of plaintiffs against the DOTD and in favor of Travelers against plaintiffs.
R. L. Booty and C. M. Smoak under two business names operated an asphalt plant in 1973, 1974 and 1975 near the Tangipahoa River Bridge, which runs roughly east and west. Finally the plant was shut down because of insolvency or bankruptcy. The plant had an access road that entered the highway (# 16) from the north, 150 feet east of the bridge. During 1973, 1974 and 1975, several individuals and companies delivered asphalt to the plant, and the DOTD and several other users of asphalt picked up asphalt at the plant. The apparatus used to place asphalt on the trucks leaked, and asphalt became deposited on the ground, which the trucks, both deliverers and receivers, picked up on their tires and deposited in lumps on the highway as they left the plant. Except where the entrance was located, where asphalt was deposited on both sides, asphalt was generally tracked on the eastbound lane going toward the east, and in the westbound lane going toward the bridge (the west). Asphalt extended in the westbound lane at least as far west as the bridge abutment.
On the morning of January 31, 1976, Brenda Mizell, with her husband Doyle Mizell, drove from Denham Springs, where they lived, to Varnado, where her mother lived, to pick up Willie Hodges, her brother, who had been in the hospital. They crossed without incident the section of highway in question going east. That afternoon they left in the Pontiac Bonneville to go back to Denham Springs. Brenda Mizell drove; her husband sat on the right front; her brother Willie Hodges sat in the right rear. Also in the car was the Mizells' son, who was a child. It was raining and some water was on the road. As they approached the Tangipahoa River, the car went into a skid, and spun around a little more than ninety degrees, the side of the car striking the left bridge abutment. Brenda, Doyle and Willie sustained severe injuries.
The plaintiffs introduced two experts, John W. Lipscomb, Jr., and Dr. Jack B. Humphreys, who testified that the car probably went into a skid as a result of partial hydroplaning when it encountered the asphalt on the highway, and that the car could have hit the abutment turned at the angle at which it was found, after going into a skid at the point the highway passed the asphalt plant entrance 150 feet east of the bridge. They testified that had the car gone into a skid farther from the bridge, in all likelihood it would have come to a stop before striking the abutment. The defendant, DOTD, introduced an expert, Dr. Don L. Ivey, who testified that for the vehicle to have spun as much as it did, it would have had to have gone into a skid more than 150 feet from the bridge, before it encountered the asphalt. The testimony of Dr. Ivey was based upon a computer programming of a cornering situation, rather than a skid situation. Although Dr. Ivey testified that this method of programming was more likely to produce a result more favorable to plaintiff, this opinion was contradicted by one of plaintiff's experts who testified that the use of a cornering situation was less favorable to the plaintiff's position. Apparently the trial court concluded that Dr. Ivey's testimony in this regard should not be given much weight since the factual situation in this case dealt with skidding. The trial court, therefore, elected not to follow Dr. Ivey's testimony but, rather, accepted the testimony of plaintiffs' experts. In that evaluation of the expert testimony, we find no abuse of the trial court's discretion. Furthermore, we think that it is entirely proper for us to consider lay testimony as to when the car went into a skid, and to accept it over Dr. Ivey's testimony, especially in view of the fact the expert testimony is in conflict. See State Department of Highways v. Moity, 276 So.2d 770 (La.App. 3rd Cir. 1973).
*1139 Brenda Mizell could not remember the point where the car went into a skid. Doyle Mizell was asleep on the front seat, and awoke only after the car had gone out of control. However, on direct testimony, Willie Hodges, who was awake at the time, testified the car encountered lumps on the highway near the bridge and all of a sudden went "berserk", completely out of control. He stated that this skid started around the little road that led to the right to the asphalt plant. Under cross examination, he stated, further clarifying his testimony, that the skid started, he would say, within 100 feet of the bridge. Thus, eyewitness testimony directly links the skid with the lumps of asphalt on the highway. Willie Hodges' testimony is internally consistent and unrebutted.
Until August of 1975, Brenda Mizell drove from Denham Springs to Varnado once or twice a month. She took the highway in question a considerable part of the time. The asphalt lumps should have been on the highway during this period. However, there is no clear testimony that she was conscious of the presence of the asphalt on these earlier trips, or that she was aware, or that she should have been aware, of the danger it posed as a result of her past experience. Thus contributory negligence has not been established or proved.
Reduced to simplest terms, three acts of negligence were alleged on the part of the DOTD: (1) permitting DOTD's trucks to deposit asphalt on the highway, (2) failing to resurface the highway or otherwise to remove the effects of the asphalt deposited on the highway, and (3) failing to post signs warning of the dangerous condition of the highway, which officials of the DOTD knew was slippery when wet as a result of the deposited asphalt. The question of Traveler's liability turned upon liability of the DOTD under (1), Travelers being liability insurer of the DOTD's dump trucks. The trial court held that liability did not exist under (1), as many trucks deposited asphalt on the highway, of which the DOTD's trucks represented only a part, albeit a substantial part, and there was no proof of the amount deposited by each.
We find the DOTD liable on grounds (2) and (3) and reverse the awarding of a so-called "directed verdict" for Travelers, and remand to permit Travelers to present its defense.
The state was clearly negligent in failing to resurface the highway or post signs warning of the existing danger. The record discloses correspondence engaged in by M. K. Johnston, Assistant District Engineer of the DOTD, to Booty and Smoak and to legal counsel for the then Department of Highways in which he discusses Johnston's knowledge that asphalt from the plant had been deposited on the highway and threatens and recommends legal action. This correspondence was engaged in before January 31, 1976, the date of the accident. Also, Mr. Johnston himself testified he knew of the dangerous situation of the road before that date. Yet, nothing was done. Not even a warning sign was posted concerning the slippery condition of the road. The only sign was a plant entrance sign. Mr. Johnston admitted the DOTD could put up signs within a couple of days of the time it became aware of a dangerous condition. The highway, but not the bridge, was resurfaced after the accident, the resurfacing having begun August 2, 1977, and having been completed October 20, 1977.
Thus, the DOTD was negligent in not resurfacing the highway or posting warning signs. It was also negligent in tracking asphalt on the highway from its trucks. The testimony reveals that at least half of the asphalt deposited was deposited by DOTD dump trucks. This asphalt was picked up by the wheels of the trucks, and deposited in lumps on the surface of the highway. If there had been but one occasion on which DOTD trucks deposited asphalt on the highway, we might find that there was no actionable negligence, but there were repeated acts of depositing asphalt on the highway over a period of several years. To fail to do something to eliminate this tracking procedure was clearly actionable negligence on the part of the DOTD and almost amounts to an intentional tort.
*1140 We hold that proof has been established of two types of negligence, failure to remove the asphalt from the highway or to resurface the highway, and failure to post signs warning of the dangerous condition of the highway, and strong evidence has been presented of a third type of negligence, repeated tracking of asphalt on the highway, and that all these were or could have been proximate causes of the accident sued upon. An injury may have more than one proximate cause. Falgout v. Younger, 192 So. 706 (La.App. 1st Cir. 1939); Tillman v. Canal Ins. Co., 305 So.2d 602 (La.App. 1st Cir. 1974), writ refused 307 So.2d 630 (1975).
The trial court found, and Travelers contends, that the DOTD and hence, Travelers, is not liable for the DOTD's trucks tracking asphalt on the highway, as many different trucks owned by or operated by different companies, agencies, and individuals deposited asphalt on the highway, and it is impossible to determine the quantity of asphalt deposited by each. However, the various owners or operators of the trucks that deposited substantial quantities by repeatedly tracking asphalt on the highway were joint tort feasors and each is a debtor in solido responsible for the whole of the debt. Hence, the DOTD and Travelers are liable for the accident sued upon, unless Travelers introduces evidence to the contrary on Travelers' presentation of its defense. It is well settled that one of multiple tort feasors may be sued singly and held liable for the whole of the debt. See Falgout v. Younger, supra; Huguet v. Louisiana Power and Light Co., 196 La. 771, 200 So. 141 (1941).
Travelers contends further that its policy does not afford coverage because the depositing of asphalt on the highways did not arise from ownership, maintenance, or use of a vehicle. Words of an insurance policy are to be accorded the meaning accorded them in their common and usual signification in general and popular use. Prestenback v. Prudential Ins. Co. of America, 257 So.2d 698 (La.App. 4th Cir. 1972). It is manifestly apparent that the tracking of asphalt on the public highway by DOTD's trucks resulted from the "use" of those trucks, in that word's general and popular signification. There can be no question that the policy applies.
Article 1810 of the Code of Civil Procedure reads as follows:
"A. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
"B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence."
Thus, in order to prevail on a "motion for a directed verdict" (as it is commonly called) in a non-jury trial, a party defendant must show plaintiff has "no right to relief." The method of approach to be applied in determining whether a "motion for a directed verdict" shall be granted, and the question of whether or not this state should follow the federal approach of permitting a trial court to weigh and evaluate testimony on defendant's motion for dismissal is considered in Roncal v. Commercial Union Assur. Co., 367 So.2d 24 (La.App. 2nd Cir. 1979), writ refused 368 So.2d 136 (1979), which we see ultimately finds it unnecessary to resolve the question. In any event, *1141 Travelers has clearly failed to show that plaintiffs have "no right to relief" against it, using the language of the newly enacted provision of the Code of Civil Procedure.
Plaintiffs have established a strong case in their favor. However, Travelers must be permitted to present its defense both as to liability and as to quantum. For this reason we make no ruling as to quantum in this opinion.
Hence, we arrive at the following determination of the cause presented:
1. It is held that liability of the Department of Transportation and Development, State of Louisiana, for failing to remove asphalt from the highway or to resurface the highway, and for failing to post signs, has been duly proved;
2. It is held that a directed verdict was improperly granted Travelers Insurance Company, and the matter is remanded to the trial court for Travelers to present its defense with regard to the liability of the DOTD and Travelers and with regard to quantum; and
3. All costs shall be paid by the DOTD.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

ON REHEARING
WATKINS, Judge.
We granted a rehearing in this case on all issues. We conclude that the doctrine of intervening cause bars recovery against the Department of Transportation and Development, State of Louisiana (DOTD), for its negligent act in tracking asphalt upon the highway and, hence, bars recovery against the motor vehicle insurer of its trucks, Travelers Insurance Company (Travelers).
There were clearly two acts of negligence in the present factual situation, (1) tracking asphalt upon the highway by the DOTD's trucks and other vehicles, and (2) the failure of the DOTD to post signs warning of the presence of asphalt on the highway or to resurface the highway. The tracking of the asphalt upon the highway ceased approximately six months before the subject accident took place, and hence the failure of the DOTD to take preventive action by posting warning signs or resurfacing was the intervening cause of the accident, making the DOTD liable for that reason alone.
Two recent Louisiana cases have applied the doctrine of intervening cause in factual situations similar to the situation presented in this case, Reeves v. Louisiana and Arkansas Ry. Co., 282 So.2d 503 (La.1973), and Tillman v. Canal Insurance Company, 305 So.2d 602 (LA.App. 1st Cir. 1974), writ refused 207 So.2d 630 (1975).
In Reeves a truck driver (acting on instructions) parked a truck across the railway track and the truck was struck by a train. The negligence of the railway was, reduced to essentials, in failing to take affirmative action to prevent the occurrence of the accident. The Louisiana Supreme Court held that the railway's negligence was the intervening cause of the accident, independent of and more proximately related to the accident than the improper parking of the truck on the track. Similarly, in the present case, negligence of the DOTD in failing to post warning signs is the intervening cause, although passive, of the plaintiffs' accident, more proximately the cause of the accident than the more remote cause in tracking asphalt on the highway.
In Tillman, gravel had been spilled on a highway on a single occasion by a gravel truck. No action was taken to remove the spill or warn of the danger. Another truck proceeding down the highway some hours later was thrown into the path of an oncoming pickup truck when it encountered the gravel. The driver of the pickup truck was killed, and an action for wrongful death was brought. The gravel company which employed the truck driver who drove the gravel truck was insured under the same policy against both comprehensive general liability and comprehensive automobile liability. The comprehensive automobile liability had a coverage limit of $10,000. The amount of damages we found was $152,381. We affirmed the trial court in holding that recovery should be under the *1142 comprehensive general liability coverage, not under the automobile liability coverage, because the negligence of the truck driver in failing to give warning of the spilled gravel was the intervening cause of the accident, preventing liability for the spilling of the gravel. The following paragraph of our opinion is pertinent:
"We must reject the defendant's contention for the reason that it was not the use or operation of the truck that caused the damage to plaintiff. It was the intervening act of negligence of the driver, apart from the operation and use of the truck, that set in motion the harm which came to Mr. Tillman. By the truck driver negligently leaving the spilled gravel on the highway unattended the hazard unmarked and the motoring public not warned, a cause of action arose for recovery of damages. There is no connexity between the vehicle from which the gravel was spilled and the failure to protect the motoring public. For these reasons, we find that the negligent act which gave rise to the cause of action for the wrongful death of Mr. Tillman did not arise out of the `use' of the automobile within the terms of the comprehensive automobile liability coverage of Fireman's Fund policy, and that coverage applicable herein is under the comprehensive general liability feature of the policy." (305 So.2d 602, 609)
Thus, in the present case, as in Tillman, the intervening cause is failure to give warning of the presence of a foreign substance on the highway, which outweighs and supersedes the spilling of the foreign substance as a proximate cause. Hence, there can be no liability on the part of the DOTD for the tracking of the asphalt, as the failure of the DOTD to post warning signs or to resurface the highway was an intervening cause of the Mizell's car going out of control upon encountering the asphalt. Therefore, we now hold that Travelers was properly granted a directed verdict in plaintiffs' cause of action against Travelers, and affirm the action of the trial court in so doing.
We also note that we stated incorrectly that no third party demands were before this court on appeal. The appeals of these demands involved the issue of liability vel non for tracking the asphalt and were taken by Travelers and DOTD against other alleged trackers of the asphalt. These appeals were not indexed, and were inadvertently overlooked by us. As we hold that the tracking of the asphalt was not the proximate cause of the accident sued upon, we dismiss all third party demands.
This leaves us the question of quantum.
Both Doyle Mizell and Willie Hodges sustained severe personal injuries in the accident, while Brenda Mizell sustained relatively minor injuries. The trial court found that both Doyle Mizell and Willie Hodges were rendered incapable of earning a living for the rest of their work life expectancy, and awarded damages for loss of income accordingly.
Plaintiffs introduced by deposition the testimony of three medical experts. No other testimony of physicians was presented by either side. The three physicians whose depositions were filed in evidence were Dr. James T. Kilroy, an orthopedic surgeon, Baton Rouge, who treated both Mr. and Mrs. Mizell, Dr. Charles A. Strange, an orthopedic surgeon, Baton Rouge, who treated Willie Hodges for a period of time beginning March 18, 1976 (the accident it will be remembered took place in January of that year), and Dr. Dorsey Dysart, a neurologist and psychiatrist, New Orleans, who saw Doyle Mizell.
Dr. Kilroy's testimony reveals that Doyle Mizell sustained a fracture of the L-1 vertebra, which increased with collapse to a 90% compression, and comminuted (meaning severely shattered) right distal radius and ulna (hand and wrist). Mizell underwent a relatively minor operation to remove foreign substances from his right elbow that had become embedded as a result of the accident. Both wrist and back injuries were very painful.
When Dr. Kilroy saw Mizell on June 24, 1977, he noticed that L-1 and L-2 vertebrae *1143 were beginning to fuse, the fusion mass also including T-12. He testified that if natural fusion does occur, that will be the best possible result as far as pain is concerned, as pain will then be greatly reduced, and Mizell will be able to do light, but not heavy work.
Mizell had worked but sporadically before the accident, partly because of a heart condition which ultimately required open heart surgery. His two work occupations were those of house painter and automobile mechanic. He had a good job as a mechanic with good possibilities for advancement before the accident. The grip strength of the right hand was severely reduced by the accident, preventing Mizell from performing intricate tasks such as turning a wrench or screw, thus making it impossible for him to work as a mechanic. He was right handed, and although he could use his left hand to paint, he could not perform full duty as a painter. He had been employed by his brother as a "charity" case, but he was virtually unemployable in his occupations as painter or mechanic in a competitive labor market. His condition was made worse by psychological problems which Dr. Dysart testified resulted from chronic pain, these being increased by hysteria, depression, and hypochondriasis. His personality difficulties tend to magnify his disability, according to Dr. Dysart.
We therefore, cannot find manifest error in the trial court's finding that Doyle Mizell was totally disabled for the rest of his working life.
The testimony of Dr. Strange revealed that Willie Hodges underwent a fusion of C-3 through C-7 vertebrae at Charity Hospital in New Orleans before he was first seen by Dr. Strange. These vertebrae were wired together to prevent their sliding backward or forward and causing injury to the spinal column. Before surgery, Hodges' pain would have been like a toothache. After surgery, the pain would result from stiffness and disuse. Narcotics would have been required until the fusion surgery was performed and the acute recuperative period completed. The fusion makes it impossible for Hodges to turn his head more than 45 degrees to the side or downwards. This inability to turn the head would make it dangerous for him to perform the types of work he did before the accident, boat captain and truck driver, nor because of this restricted motion could he return to two other former occupations, deckhand and mechanic. Dr. Strange thought he might be able to perform some type of work as a welder wearing goggles, for perhaps three or four hours a day, at the most. However, we consider this or any other possible employment a remote possibility in the labor market, in which an eight hour day is generally a minimum requirement.
We, therefore, cannot find that the trial court was clearly wrong or manifestly erroneous in finding that Willie Hodges was totally disabled for the rest of his working life.
It is true that both Hodges and Mizell had spotty employment records. However, both had had prior medical difficulties that were in the process of clearing up, and both had good possibilities of future employment. Hodges' medical conditions that had interfered with employment were "fungus" of the bone (to use Hodges' terminology, which may be incorrect, even as a lay term) and a cyst. Mizell had undergone open heart surgery. All these problems were in the past, and but for the accident, the future for both was more or less promising.
Dr. Jan Dugger, an economist, who had taught in the LSU Department of Economics from 1967 until 1972, was accepted by the Court as an expert in economics. Dr. Dugger had calculated and his testimony presented into evidence the loss of income of Doyle Mizell and Willie Hodges from the date of the accident to the date of trial. He also testified as to the present value of the future loss of income to be sustained by Mizell and Hodges, based upon a range of hypothetical situations, explaining in detail the statistical and actuarial bases which support the method of calculation he employed to arrive at the present value of their losses of income. Hodges was born on January 1, 1943 and Mizell was born on *1144 January 7, 1942. Dr. Dugger testified that Hodges had a work life expectancy of 29.5 years, and Mizell a work life expectancy of 28.4 years at the time of the accident.
With regard to Hodges, we note, the trial court used as a basis for its determining lost wages $200 per week. In giving several projections, Dr. Dugger, we note, did in fact make one projection based upon postulated earnings of $200 per week. The trial court in written reasons adopted the figure of $200 per week as the amount of earnings of Willie Hodges which it states was established by the record. In this assertion, we find, it was clearly wrong, and in basing lost past and future wages upon this figure, it clearly abused the broad range of discretion accorded the trier of fact in awarding damages. In 1975, the year immediately prior to the accident, Hodges' earnings reported for Social Security purposes under Social Security No. XXX-XX-XXXX were $5,924.20. (Hodges contends that he had two Social Security numbers, with earnings under each, but this assertion is not supported by the exhibits which Hodges contends support this assertion.) Hodges' earnings for earlier years were in no case equal to even half his 1975 earnings. The record shows that in the period October 2, 1975 through December 26, 1975, approximately a nine week period, Hodges earned $990 as a truck driver driving for Easterly Trucking Co. Using the annual earnings of $5,924.20 in 1975, weekly earnings were $113.93. If we use the $990 earnings in 9 weeks, weekly earnings were $110. Both amounts were only about half of the $200 per week used by the trial court in applying Dr. Dugger's projections based on various postulated earnings. The use of the $200 per week figure was clearly wrong and an abuse of the trial court's "much discretion" which it enjoys under LSA-C.C. art. 1934.
We do not find that the trial court abused its much discretion in its adopting as a method for determining present value of future loss of income the method used by Dr. Dugger. Its error was in the use of $200 as the postulated earnings loss per week for Hodges, because as we have stated above, the record does not support this amount. We find that the highest amount of weekly earnings loss that it would be permissible to use to calculate present value is $113.93, the average weekly earnings of Hodges for 1975, which is 57% of the sum of $200 per week used by the trial judge as postulated weekly earnings.
Dr. Dugger used as a discount various percentages, among them 5%, which was adopted by the trial court, and which use we cannot say was clearly wrong. Applying a 5% discount and using an overall increase of earnings of workers in Louisiana of 5.8%, which allows for a deduction for cohort survival of about 1% (cohort survival being the allowance for the number of individuals likely to die in one year), Dr. Dugger determined that the present value of Hodges' loss of future income was $276,993. Assuming postulated earnings of $200 per week, Dr. Dugger found the amount of lost earnings to time of trial to be $30,000. Both past and future earnings must be corrected by the figure of 57%, which is the corrective we have determined must be applied to reflect proven actual earnings of Hodges immediately before the accident.
Dr. Dugger used as a basis of Doyle Mizell's earnings his weekly earnings of $174 while working for Tune-Up, Inc. We do not find this basis incorrect, or its use to have been clearly wrong. Using the method used for Hodges, the trial court found the amount of lost earnings by Doyle Mizell to the time of trial to have been $26,100, and $230,044 to be the present value of the loss of future income, or a total amount of lost earnings of $256,144.
The DOTD contends that it was a clear abuse of discretion to have used in determining lost wages, past and future, for Doyle Mizell and Willie Hodges sums considerably higher than their overall average past earnings over a period of several years. We have herein reduced the award for lost wages to Hodges, but even this amount is subject to the same possible contention, because the basis for lost past and future earnings in our decision is larger than the average sums earned in prior years. The *1145 answer to that contention is that both Hodges and Mizell had been in bad health, and were only just commencing to pull out of their somewhat disabling medical conditions at the time of the accident. The measure of lost earnings is not the amount actually earned at the time of injury; rather, it is the amount of the earning capacity. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The amount of actual earnings of Doyle Mizell and Willie Hodges over a period of several prior years is not a proper measure of lost earnings in the present case, as the amount of earnings immediately before the accident, when both were finally recovering from disabling medical conditions, was more nearly reflective of earning capacity.
The trial court awarded general damages in the sum of $175,000 to Willie Hodges and $100,000 to Doyle Mizell. Both suffered severe pain, and suffered 10% to 15% loss of function in their entire physical makeup. We find the awards to both generous, or rather high. However, the trier of fact has much discretion, and its award should not be disturbed unless that discretion was clearly abused. We are charged by the highest court of our state not to decide what we consider an appropriate award, but to review the trier of fact's exercise of discretion in that determination to see whether or not there was a clear abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). An award of a similar amount in general damages was affirmed in Daigle v. Lang, 377 So.2d 1384 (La.App. 4th Cir. 1980), a case which involved spinal injuries, and hence involved injuries similar to those sustained by Willie Hodges and Doyle Mizell, except that Mizell suffered injuries to the hand and wrist which further increased his disability and suffering. We cannot say that either award was a clear abuse of discretion in the light of Reck and Daigle. We cannot substitute our judgment for that of the trial court.
Dr. Kilroy in his testimony in deposition stated that Mrs. Brenda Mizell sustained "a very, very mild cervical sprain" as a result of the accident. She was awarded general damages of $20,000. That award we find was extremely excessive and constituted a clear abuse of the discretion granted the trier of fact. See, for example, the quantum of the awards in Skinner v. Nightingale, 377 So.2d 1348 (La.App. 1st Cir. 1979), and Hanzy v. Sam, 385 So.2d 355 (La.App. 1st Cir. 1980), writ refused 386 So.2d 357 (1980). We will reduce the award to the largest sum conceivably permissible in the exercise of the trial court's much discretion, and reduce general damages to Brenda Mizell to $5,000.
We have carefully reviewed medical expenses and expert witness fees awarded and charged by the trial court, and find no error in the sums awarded.
The trial court inadvertently failed to award legal interest specifically in the judgment. That minor oversight may be corrected by this court on appeal. See Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843 (La.App. 3d Cir. 1979).
Therefore:
(1) The judgment for loss of past and future income in favor of Willie Hodges is reduced to the sum of $174,986.01 with legal interest from date of judicial demand.
(2) The judgment in favor of Doyle Mizell is affirmed, with legal interest from date of judicial demand.
(3) The judgment in favor of Willie Hodges for sums other than loss of income is affirmed, with legal interest from date of judicial demand.
(4) The judgment in favor of Brenda Mizell for pain and suffering is reduced to the sum of $5,000, and affirmed for medical expenses, with legal interest from date of judicial demand.
AFFIRMED IN PART, AMENDED IN PART, AND RENDERED.